IN the INTEREST OF B.J.C., G.J.C.,
and G.E.C., Children

NO. 14–15–00904–CV

Court of Appeals of Texas,
Houston (14th Dist.).

Opinion Filed February 4, 2016

William M. Thursland, Houston, TX, for Appellant.

Sandra D. Hachem, Houston TX, for Appellee.

Panel consists of Justices Christopher, McCally, and Busby.

## OPINION

Sharon McCally, Justice

Appellant M.C. ("Mother") appeals the trial court's final decree terminating her parental rights, and appointing the Department of Family and Protective Services (the "Department") as sole managing

conservator of B.J.C. ("Bonnie"), G.J.C. ("Gabrielle"), and G.E.C. ("Gordon").[1] On appeal appellant challenges the legal and factual sufficiency of the evidence to support the trial court's findings under Texas Family Code section 161.033 under which her parental rights were terminated. We affirm the termination of Mother's parental rights.

## I. Factual and Procedural Background

### A. 2008 Removal and Motion to Modify

On April 28, 2008, the Department received a report that the children were not being properly supervised; they were seen either wearing dirty clothes, or running around outside wearing no clothes. The children were frequently seen outside playing naked, and sometimes seen urinating and defecating outside. Neighbors in the apartment complex complained about the smell of urine and feces coming from the apartment where the children lived.

On October 7, 2008, a Department caseworker entered the apartment and reported being overwhelmed by the smell of urine as well as houseflies and gnats. At that time Mother was given three days to clean her apartment. Three days later the caseworker returned, but found little improvement. Mother agreed to voluntarily place the children with a friend. Another three days later the caseworker returned and found that the conditions of the home had "greatly improved." The children were returned home and the family began receiving intensive Family Based Safety Services (FBSS).

Over the course of 2008 and 2009, the Department worked closely with Mother in

---

1. Pursuant to Texas Rule of Appellate Procedure 9.8, we will use fictitious names to refer to the children.

attempting to get her house cleaned, purchase clothing for the children, and pay her rent and medical bills. The Department arranged for a home therapist to provide individual counseling and for a homemaker to teach Mother childcare, cleaning, and safety skills. Periodic home visits revealed that the apartment was still very dirty and contained live roaches in the kitchen and dead roaches on the ceiling. On April 6, 2009, the children's daycare director reported that the Mother failed to pick up the children. A babysitter arrived an hour later stating she forgot to pick up the children.

In May 2009 the therapist reported that on a recent home visit there were several men in the apartment with Mother. Mother told the therapist not to report the men to the Department. The next day a homemaker working on behalf of the Department, and the caseworker, visited the home and observed the smoke detector on the floor of the apartment. Mother reported that she removed the smoke detector because it would not stop ringing. When the homemaker picked up the smoke detector and shook it, "dozens of roaches" fell out. There were roaches all over the kitchen including some roaches inside an open can of powdered drink mix.

The caseworker visited eight-year-old Bonnie at school in May 2009. Bonnie reported that Mother puts cotton in her ears so the roaches will not crawl in her ears at night while she sleeps. Bonnie reported that when she was seven years old she spent the night with her babysitter. The babysitter's husband touched Bonnie "under her panties with his hand." After that incident Bonnie does not spend the night at the babysitter's home.

On June 18, 2009, the Department filed an original petition for termination of Mother's parental rights. On January 27, 2011, the Department was appointed sole

managing conservator of the children, but Mother's parental rights were not terminated. Mother does not have location information about any of the children's three fathers.

On March 21, 2012, Mother filed a motion to modify in suit affecting the parent-child relationship. Mother requested that she be appointed sole managing conservator of the children. Mother stated that she had stable housing and employment, was participating in individual counseling, and that it would be in the children's best interests to be reunited with her.

On December 27, 2012, Mother signed a family service plan in which she agreed to:

- obtain and maintain housing that is a clean environment for herself and her children;

- actively participate in family therapy sessions;

- complete another psychological evaluation and follow all recommendations;

- attend all meetings, court hearings, permanency conferences, and follow all recommendations of the Department, therapists, the court, and Children's Crisis Care Center;

- obtain and maintain legal and verifiable employment for at least six consecutive months;

- obtain a support system and provide the worker with a list of these individuals with their contact information explaining how they will be of support to her;

- refrain from all criminal activity and refrain from interacting with individuals who participate in criminal activity; and

- complete another psychiatric evalua-

tion specifically through MHMRA[2] and follow all recommendations.

On August 11, 2014, the Department filed a motion to modify conservatorship and for termination of Mother's parental rights. The Department alleged that termination of Mother's rights was warranted under section 161.003 of the Texas Family Code because she:

has a mental or emotional illness or a mental deficiency that renders the mother unable to provide for the physical, emotional, and mental needs of the children and will continue to render the mother unable to provide for the children's needs until the 18th birthday of the children, despite at least six months of reasonable efforts to return the child to the parent.

**B. Trial Testimony**

Dr. Paul Damin testified that the Department contracted with him to assess Mother's parenting ability. Damin conducted intellectual, emotional, and parenting assessments on Mother. Damin found that Mother had limited cognitive abilities, which he classified as extremely low range. Damin also found emotional functioning consistent with a low level of cognitive ability and that Mother has difficulty understanding problem situations as well as determining adequate or effective solutions in those situations. Damin determined that in order to parent her children Mother needed assistance from a competent, reliable person who could observe her with her children to ensure the children's safety. Mother's low level of cognitive and emotional functioning is a permanent condition not subject to treatment.

In Damin's testing of Mother he gave her a GAF[3] score of 60, out of a possible 100. Damin admitted that in many cases a person with that score can parent her children. Damin further explained that the GAF score reflects some emotional and adjustment issues associated with the stressors in Mother's life. The cognitive and intellectual aspects of the assessment are not reflected by the GAF score. Damin described Mother as having borderline intellectual functioning. Damin concluded that Mother is incapable of independently parenting her children.

Damin's written evaluation was admitted into evidence. In that evaluation Damin noted that Mother, even through an interpreter, had limited comprehension of what was asked of her. Damin reported that Mother's judgment and abstract reasoning appeared to be extremely limited, and was likely to adversely affect daily functioning. Mother's scores indicated that her cognitive functioning is considerably lower than the majority of her same-age peers. Damin noted that in conducting certain tests the interpreter had to assist Mother in the comprehension of test items, which were provided in Spanish. Damin ruled out the language barrier as the source of Mother's comprehension issues. Taking into account Mother's comprehension issues, Damin concluded Mother indicated strong tendencies to reverse family roles, a low level of empathic awareness, and a tendency to be demanding and controlling as a parent. Damin recommended that Mother continue with individual psychotherapy with the assistance of MHMRA services. Damin opined that while this assistance would help Mother in her day-today functioning, her level of cognitive functioning is permanent and untreatable.

Sylvia Greenbaum was a therapist contracted by the Department to counsel

**2.** Mental Health and Mental Retardation Authority of Harris County

**3.** Global Assessment of Functioning

Mother and the children in 2009 and 2010, and again from November 2011 to September 2013. During therapy the children raised instances of inappropriate and abusive discipline by Mother. Bonnie expressed trauma from the abusive discipline, but Mother was unable to comfort Bonnie until prompted to do so. Despite Gordon's diagnosis of Attention Deficit Hyperactivity Disorder, Mother did not recognize the diagnosis or take steps to ensure Gordon received appropriate medication and therapy. Greenbaum recognized some progress in Mother's ability to be more positive and affectionate with her children.

Greenbaum agreed with Damin that Mother could not independently parent her children. Greenbaum testified that Mother made no progress toward getting help from a responsible adult with parenting her children. Greenbaum did not anticipate that Mother could be the primary caregiver even if she found another adult to help care for the children. Greenbaum further testified that Mother did not attend sessions at MHMRA, which could have assisted her.

Deedra Redd was the original caseworker from 2009 and continued as the caseworker at the time of trial. Redd testified that the Department made numerous attempts to help Mother make arrangements with other adults, but all attempts failed, primarily due to Mother's behavior. Redd testified to the conditions of the home at the time of the original removal, and that the agency associated with FBSS helped pay for Mother's apartment and its maintenance. The Department attempted to place the children with fictive kin[4] six times, and attempted three home studies in an attempt to find a responsible adult to help Mother parent her children.

The first fictive kin placement was the maternal uncle. When the Department contacted the uncle they realized that Mother had misrepresented the level of responsibility required. The uncle thought he would be able to accept the children but then return them to Mother. When the Department explained that they were looking for an adult to take primary responsibility for the children, the uncle declined the placement.

The next attempted placement was Mother's friend on whom a home study was conducted. The children began weekend visits with Mother's friend, but the family declined to continue the process due to Mother's behavior. Redd testified that Mother was "very unclean" in her friend's home during the children's weekend visits and would be belligerent to the potential caregivers about certain documents she was requesting. The family "felt like [Mother] was harassing them and wanting to see the children at all times of day and basically being belligerent when she requested to see the children." The third fictive kin placement also broke down due to Mother's belligerent behavior.

The Department was unable to verify Mother's employment or housing. Mother provided the Department with check stubs as evidence that she was working, but when the Department called to verify employment, they learned that a different Social Security number was being used that did not belong to Mother. The Department also tried to verify Mother's housing in San Antonio, but when they investigated the address they learned the address did not exist. On another residence, the apartment manager said she had never heard of Mother. A third resi-

---

4. 4 In this context, "fictive kin" refers to potential foster families who are not related by blood or marriage to the children's parents.

dence was verified, but Mother did not live there more than a few months.

Redd testified that despite complying with the family service plan and participating in services provided to her, Mother consistently failed to make progress in her parenting abilities. Redd testified that the children are very intelligent and know what is "going on with their case." The primary need for the children is a permanent, stable home. Redd further testified to the assistance given to Mother by FBSS and the Department during the first removal of the children. Mother's parental rights were not terminated at that time because the Department was working with fictive kin to attempt to place the children and allow Mother visitation.

Tequilia Armstrong, the current caseworker, testified that Bonnie, the oldest child, expressed to her that she loves her mother but does not want to live with her. Armstrong has seen no bond between the children and Mother. Armstrong visited the children monthly and stated the children expressed their desire to be adopted. When the case was assigned to Armstrong, a "no contact" order was in place. Armstrong relayed messages from the children to Mother. In the messages, the children expressed, "we love her; but, you know, we all want to stay together and ... be in a home where [we] can see a mom and a dad all the time."

Bonnie, the oldest child, told Armstrong that the foster home they lived in was clean and the foster parents ensured the children were clean and wellgroomed. Bonnie told Armstrong she was doing better in school and that her siblings were doing better when they had been placed in foster care.

Following the bench trial, the trial court found grounds for termination under section 161.003 of the Family Code.

## I. Termination under Section 161.003

In her sole issue, Mother argues that the evidence is legally and factually insufficient to support a finding that her parental rights should be terminated pursuant to Section 161.003 of the Family Code.

■ The Family Code permits termination of parental rights if (1) the parent suffers from a mental deficiency as set forth in Section 161.003 of the Family Code, and (2) termination is in the best interest of the child. *See* Tex. Fam.Code Ann. § 161.003(a) (West 2014). There is a strong presumption that the best interest of the child is served by preserving the parent-child relationship, and the burden of proof rests upon the party seeking to deprive the parent of her parental rights. *See Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976); *In re C.L.C.,* 119 S.W.3d 382, 390–91 (Tex.App.—Tyler 2003, no pet.).

Section 161.003(a) of the Texas Family Code permits the termination of parental rights if five elements are met. Tex. Fam. Code Ann. § 161.003(a). Termination of the parent-child relationship may be ordered if the court finds that:

(1) the parent has a mental or emotional illness or mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child;

(2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;

(3) the department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination[;]

(4) the department has made reasonable efforts to return the child to the parent; and

(5) the termination is in the best interest of the child.

Tex. Fam.Code Ann. § 161.003(a)(1)-(5).

### A. Standard of Review

 Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex.App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

 Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam.Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.— Houston [14th Dist.] 2008, no pet.).

 In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336 (Tex.2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex.App.— Houston [14th Dist.] 2014, no pet.).

 In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex.2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

### B. Mental Deficiency and Ability to Meet Children's Needs

 A mental illness or deficiency of a parent is not, in and of itself, grounds for termination of the parent-child relationship. *See Liu v. Dep't Family & Protective Servs.*, 273 S.W.3d 785, 791 (Tex. App.—Houston [1st Dist.] 2008, no pet.). There must be evidence to support a determination that a parent's mental illness or deficiency excludes her from providing for her children now and in the future. *See In re A.L.M.*, 300 S.W.3d 914, 928–29 (Tex.App.—Texarkana 2009, no pet.).

Mother does not challenge the sufficiency of the evidence on subsections (3) and (4). The Department has been the sole temporary managing conservator of the

children for at least six months prior to the trial on termination, and the Department made reasonable efforts to return the children. Instead, Mother challenges the sufficiency of the evidence to support the trial court's finding that a mental deficiency renders her unable to provide for the physical, emotional, and mental needs of the children and that the deficiency, in all reasonable probability, will continue to render her unable to provide for the children's needs until their 18th birthdays. Specifically, Mother argues the evidence failed to address the physical, emotional, and mental needs of the children, and failed to show a causal connection between Mother's mental deficiency and the inability to meet the children's needs.

After reviewing several cases in which the termination of parental rights was affirmed under section 161.003, the Texarkana Court of Appeals noted a trend:

> When the evidence is less convincing of the parent's complete inability to parent, appellate courts are still willing to affirm termination on this ground when the evidence establishes special, extensive medical or emotional needs of the children. *See Rodriguez* [*v. Texas Dept. of Family and Protective Services*, No. 03–05–00321–CV], 2006 WL 1358488, *1–2, [ (Tex.App.—Austin May 19, 2006, no pet.) (mem.op.) ]. Other cases make little or no mention of the specific needs of the child when evidence of the mental illness or deficiency make it clear that the parent is unable to meet the needs of a child without severe problems. *See Liu*, 273 S.W.3d at 787; *Salas* [*v. Texas Dept. of Protective and Regulatory Servs.*], 71 S.W.3d [783], 785–87 [ (Tex.App.—El Paso 2002, no pet.) ]. The needier the child, the more able the parent must be.

*In re A.L.M.*, 300 S.W.3d at 919.

Mother argues that the State produced no evidence that the children had special,

extensive medical, or emotional needs. The record reflects that the children did not have severe problems, and were not in need of special care. In this case, however, the emphasis of the Department was on Mother's ability to independently parent her children rather than on the special needs of the children. The evidence is sufficient to show that Mother was unable to care for herself or her children, provide a safe, sanitary home for the children, or keep the children clothed and fed.

The evidence shows that Mother suffered from permanent cognitive deficiencies that rendered her unable to provide for the care of her children. These deficiencies persisted over the seven years the children were in and out of the care of the Department despite financial, psychological, and educational assistance to Mother. Despite Mother's participation in services afforded her by the Department and other State agencies, Mother failed to progress and show that she can independently parent her children or obtain the assistance of a responsible adult.

Dr. Damin reported that Mother's judgment and abstract reasoning appeared to be extremely limited and likely to adversely affect daily functioning. Damin concluded that Mother's mental deficiency was permanent and incapable of treatment. Mother challenges Damin's findings because the results of some tests were suspect due to the interpreter's assistance. But the tests were written in Spanish, Mother's first language. The interpreter helped Mother because she could not read the tests, comprehend the tasks, or write her answers on her own. Damin opined that the language barrier was not the reason Mother could not understand the test questions. The interpreter's assistance underscores Mother's limited cognitive ability in daily functions.

Damin concluded that Mother was incapable of parenting her children without assistance. The caseworkers testified that they spent a considerable amount of time attempting to find a suitable adult to assist Mother with her children. Each of the Department's attempts were thwarted by Mother's behavior. As Damin testified, her behavior is not capable of treatment and will not change through the life of the children. Greenbaum expressed the opinion that Mother was incapable of parenting the children even with the full-time help of another adult.

We conclude the evidence is both legally and factually sufficient to support the trial court's findings that Mother's mental deficiency renders her unable to provide for her children's needs and, in all reasonable probability, the mental deficiency from which Mother suffers will continue to render her unable to provide for her children's needs until their respective eighteenth birthdays.

### C. Best Interest of the Children

Mother further contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her rights is in the best interest of the children. *See* Tex. Fam. Code Ann. § 161.003(a)(5).

The factors the trier of fact may use to determine the best interest of the child include: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976); *In re U.P.*, 105 S.W.3d 222, 230 (Tex.App.—Hous. [14 Dist.] 2003); *see also* Tex. Fam.Code Ann. § 263.307(b) (West 2014) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

There is a strong presumption that the best interest of a child is served by keeping the child with his or her natural parent. *In re D.R.A.*, 374 S.W.3d at 533. Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam.Code Ann. § 263.307(a).

Mother contends that the presumption in her favor is not rebutted because she complied with the family service plan, she does not have a criminal history or history of drug abuse, and there is no history of domestic violence or abusive and neglectful conduct.

### 1. Current and Future Needs of the Children

The children were originally removed from the home because they were not clothed, were permitted to urinate and defecate outside, and were living in a home crawling with roaches. Since their initial removal the children have not experienced those circumstances because they were living in foster care. The oldest child reported sexual abuse when she spent the night with the babysitter Mother had hired. She also reported that Mother put cotton balls in her ears at night to prevent roaches from crawling into her ears.

### 2. Stability and Compliance with Services

In determining the best interest of the children in proceedings for termination of parental rights, the trial court may properly consider whether the parent complied with the court-ordered service plan for reunification with the children. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex.2013).

In this case, the caseworker testified that Mother complied with the family service plan. However, there was testimony that Mother failed to maintain a stable home or employment, reported a false address, and used another individual's Social Security number. Moreover, the record reflects that despite compliance with the service plan and participation in services, Mother was unable to maintain a stable home and independently parent her children.

### 3. Children's Desires and Proposed Placement

The two younger children did not express a desire, but the oldest child expressed trauma from Mother's abusive discipline. Armstrong, the current caseworker, testified that Bonnie, the oldest child, expressed to her that she loves her mother, but does not want to live with her. Armstrong has seen no bond between the children and Mother. Appellant points out that the record reflects the younger children "just kind of go along" with Bonnie. When the children were informed that Mother's rights had been terminated, they asked whether they could see their mother for a goodbye visit. Armstrong testified that the children's therapist "didn't see anything wrong" with the children visiting their mother after her rights had been terminated. The court questioned Armstrong on the potential for a goodbye visit, and Armstrong explained that the therapist had not been seeing the children very long and could have been indecisive about the proposed goodbye visit. The parties agreed to further explore a "goodbye visit" with Mother and the ramifications for the children.

The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the children's best interest. *See In re J.N.R.*, 982 S.W.2d 137, 143 (Tex.App.— Houston [1st Dist.] 1998, no pet.). A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a best interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex.App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the children is relevant to the best interest determination. *See In re C.H.*, 89 S.W.3d at 28.

Here, the Department spent considerable time and effort in trying to place the children with fictive kin. Each time the Department tried to place the children, however, they were unsuccessful. In most instances, Mother's behavior was the cause of the potential family deciding not to accept the children. At the time of trial the children were placed in an emergency shelter. Redd testified that recent attempts at foster placement had been unsuccessful because the children were not available for adoption. "[T]he lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located." *Id.* The record reflects that family members were not an option for permanent placement.

### 4. Acts or Omissions of the Parent

As stated earlier, the children were removed from unsanitary conditions in the

home that Mother appeared incapable of correcting even with the assistance of FBSS and the Department. During therapy the children raised instances of inappropriate and abusive discipline by Mother. Bonnie expressed trauma from the discipline, but Mother was unable to comfort Bonnie until prompted to do so. Despite Gordon's ADHD diagnosis, Mother did not recognize the diagnosis or take steps to ensure Gordon received appropriate medication and therapy.

Applying the applicable *Holley* factors to the evidence, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination of Mother's rights was in the best interest of the children. We overrule Mother's sole issue on appeal and affirm the trial court's judgment.