

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00100-CV

**IN THE INTEREST OF V.L.M.**, a Child

From the 438th Judicial District Court, Bexar County, Texas
Trial Court No. 2016PA02374
Honorable Barbara Hanson Nellermoe, Judge Presiding[1]

Opinion by:    Marialyn Barnard, Justice

Sitting:       Sandee Bryan Marion, Chief Justice
               Karen Angelini, Justice
               Marialyn Barnard, Justice

Delivered and Filed:  July 25, 2018

AFFIRMED

This is an appeal from a trial court's order terminating appellant mother's (Mother) parental

rights to her child, V.L.M.  On appeal, Mother argues the evidence is legally and factually

insufficient to support the trial court's predicate findings under section 161.003(a) of the Texas

Family Code ("the Code") under which her parental rights were terminated.  We affirm the trial

court's order of termination.

## BACKGROUND

The record reflects V.L.M., who was born in January 2016, was diagnosed at birth with

dysmorphic facies and a chromosomal anomaly.  The diagnosis suggested V.L.M.'s mother, was

---

[1] The Honorable Rosie Alvarado is the presiding judge of the 438th Civil District Court, Bexar County, Texas.  The Honorable Barbara Hanson Nellermoe, retired, was sitting by assignment and signed the order that is the subject of this appeal.

a victim of incest. The hospital performed genetic testing, which confirmed V.L.M.'s father was a first degree relative to Mother. The results were shared with the Texas Department of Family and Protective Services ("the Department"), which had also received a referral, alleging Mother had an intellectual disability and was negligently supervising V.L.M. Thereafter, the Department attempted to visit Mother and V.L.M., but was unable to locate them. After approximately six to seven months of searching, Department caseworker Anna Smith found the family, who was living in a motel room.

According to Smith, Mother and V.L.M. were living in the motel room with Mother's parents and three siblings. The motel room was a single room with two beds and no proper sleeping arrangement for V.L.M. In the room, Smith found a bag containing a large assortment of prescription pills, which were not prescribed to anyone in the room. Smith also found a bottle of medicine that was being administered to V.L.M. Smith testified the label was not legible. In addition to finding medication, Smith stated Mother's father was extremely hostile and confrontational during her interaction with him. Smith claimed that during her visit, Mother's father threatened her, and as a result, she called 9-1-1.

Due to the concern that V.L.M. was not being properly cared for and potentially sleeping in the same room as an alleged sexual abuser, the Department removed V.L.M. from Mother's care. V.L.M. was then placed with a foster family, and a service plan was prepared for Mother, which included psychological counseling and parenting classes. According to Smith, the Department focused on designing a plan that would help Mother gain a working understanding of V.L.M.'s medical needs and teach Mother how to parent. During the course of the service plan, Mother became pregnant with her current boyfriend S.C. and prenatal care was added to the plan.

Due to the lack of progress, the Department ultimately sought to terminate Mother's parental rights to V.L.M. At the bench trial, the trial court heard testimony from several witnesses,

including Dr. Jennifer Beth Mazer, V.L.M.'s pediatrician; Brieanna Flowers, a pediatric nurse practitioner who worked with V.L.M.; Dr. Ann Marie Hernandez, a clinical psychologist who examined Mother; Brenda Martinez, Mother's counselor; Department caseworkers, Anna Smith and Lesley Oxendine; Mother; and S.C., Mother's current boyfriend.

Dr. Mazer began seeing V.L.M. when she was eleven months old and under her foster parents' care. During the bench trial, Dr. Mazer testified V.L.M has a number of conditions that require special care, including "developmental delay of speech, she has fine motor and gross motor delays; she has scoliosis; she has what we call labial adhesions; she has dysphagia [which is a problem with swallowing]; as well as obstructive sleep apnea; she has microencephaly, meaning a small head; she's had nasal lacrimal duct obstruction, which basically means the tear duct is obstructed; and then, of course, chromosomal abnormalities." As a result, V.L.M. sees several specialists, including a speech therapist, a physical therapist, and an occupational therapist. According to Dr. Mazer, she has seen V.L.M. approximately eighteen times; Mother attended some of these appointments with V.L.M.'s foster mother. Dr. Mazer testified that although Mother expressed interest in V.L.M., she believed Mother did not have a full understanding of V.L.M.'s needs. Specifically, Mother could not answer pointed questions about V.L.M.'s needs or development. For example, Mother did not know any of V.L.M.'s medical history or current conditions, and she also did not know when V.L.M.'s surgery for correction of the blocked tear ducts was scheduled. Dr. Mazer further testified it was important for a parent to understand V.L.M.'s needs and be able to relay information about her progress at each appointment because doctors rely on a parent to carry out the recommended medical plan and track progress. Dr. Mazer continued, stating doctors base future plans on the information being relayed to them. In addition to these concerns, Dr. Mazer also expressed concern about Mother's own developmental delays, emphasizing it was important for V.L.M. to have a model upon which to base her behavior. Dr.

Mazer testified that if a parent was developmentally delayed herself, that could hinder a child's progress. Dr. Mazer added that in order for V.L.M. to grow and thrive properly, she needed special, attentive care that involved seeing each of her specialists routinely and taking a number of prescribed medications regularly.

The trial court also heard testimony from Brieanna Flowers, a pediatric nurse practitioner, who works with V.L.M. In addition to describing V.L.M.'s special needs, Flowers explained it was important for a parent to understand V.L.M.'s needs. Flowers testified "the role of the parent" during each appointment is to relay information about how V.L.M. was doing and any specific concerns the parent had. With regard to Mother, Flowers testified she met Mother during one of V.L.M.'s appointments and Mother was unable to give any answers to her questions. Specifically, Flowers testified she talked to Mother about the genetic testing results and asked her questions about V.L.M.'s conditions and medical history, but Mother was unable to answer any of the questions.

With regard to evidence regarding Mother's abilities, the trial court heard testimony from Dr. Ann Marie Hernandez, who conducted the initial evaluation on Mother when she was referred for a psychological exam by the Department. The evaluation showed Mother has an IQ of 58. According to Dr. Hernandez, Mother exhibited "a limited understanding" as to why V.L.M. was removed from her care. Dr. Hernandez also indicated Mother was unable to complete the evaluation without assistance, which concerned the doctor with respect to Mother's ability to parent and make independent decisions. Dr. Hernandez further testified Mother exhibited higher than average stress when presented with certain parenting scenarios. Specifically, Mother's particular stressors were an "inability to kind of manage and control the child" as well as make "some of the sacrifices that parents have to make on a day-to-day basis." Dr. Hernandez continued,

testifying she believed Mother would have issues understanding medical directions, problem-solving, and dealing with unpredictable situations.

Brenda Martinez, Mother's counselor, also testified as to Mother's abilities to parent V.L.M. Specifically, Martinez testified she began seeing Mother a few months after V.L.M. was removed from her care. Martinez stated Mother is "fairly consistent" with her appointments, but there were weeks when she failed to appear without explanation. Martinez testified that based on a psychological exam she conducted, Mother has an intellectual delay and speech impediment. Martinez explained Mother appeared to understand why the Department became involved with V.L.M. and was making some progress with her "adulting" skills. Martinez added, however, that Mother was unable to discuss V.L.M.'s medical issues, which indicated to her that Mother was not participating in the doctor appointments and failing to ask necessary follow-up questions. Specifically, Martinez testified, "it goes back to the decision-making skills and knowing when to ask questions or knowing when to kind of pull back. It goes back to decision-making for me, that she's lacking some adaptive decision-making skills." When asked about whether Mother could care for two children, Martinez testified she did not believe Mother made enough progress to care for two children, particularly V.L.M., who has special needs. Martinez stated that with respect to a healthy child, she believed Mother was capable of making certain decisions, but "[f]or a child that she doesn't understand the medical conditions, I would be concerned." Martinez added she believed Mother would need some supervision to care for V.L.M.

With regard to whether she believed Mother could care for V.L.M. in the near future, Martinez testified she did not think Mother could make enough progress in the next 90 days to care for V.L.M. properly. Martinez described Mother's cognitive abilities as "slow, but positive." Martinez further explained she believed Mother had "cognitive distortions like denial and minimization," which makes it challenging for a person to make the changes necessary for the

future, specifically the future return of V.L.M. to her care. Martinez also added that she learned Mother was a victim of past abuse, and she believed that as a result of the abuse she endured, Mother's ability to parent now and in the future was negatively impacted.

Martinez also provided testimony as to Mother's judgment skills, specifically Mother's ability to identify who she should associate with. According to Martinez, she believed Mother lacked good judgment with regard to identifying those she could trust. Martinez further testified that at no point during her counseling sessions was Mother able to address the sexual abuse allegations. Martinez testified that based on Mother's disability and the fact that the genetic testing showed V.L.M.'s parents were related by the first degree, it was highly likely Mother was subjected to some sort of sexual abuse, but was unable to cope with it. With respect to Mother's current relationship, Martinez expressed concern that Mother was exhibiting "deviant behavior," particularly because her current boyfriend — who was the father of her second child — was significantly older than her, and as a result, could manipulate her decision-making skills.

In addition to this testimony, the trial court heard testimony from Department caseworkers, Anna Smith and Lesley Oxendine, who were each involved with the family and provided testimony as to their interactions with Mother. Smith testified she was the initial caseworker assigned to the case who contacted the family after the Department found them living in a motel room. Smith described her initial meeting with the family as tense and stated Mother's father did not allow Mother to speak. According to Smith, she believed Mother's father controlled the family, including Mother, and that Mother was "a victim of her father."

After V.L.M. was removed from Mother's care, Oxendine began working with Mother and designed Mother's service plan. According to Oxendine, Mother did not complete either her counseling services or parenting classes, but added that the parenting classes were ongoing until the next year and Mother was attending them. Oxendine testified, however, that she believed

Mother did not understand V.L.M.'s medical needs, and during her visits with V.L.M., Mother struggled to care for V.L.M. properly. For example, if Mother would attempt to change V.L.M.'s diaper, feed V.L.M., or put on V.L.M.'s shoes, and V.L.M. would not cooperate, then Mother would give up. As a result, V.L.M. would remain in an unchanged diaper, unfed, or barefoot. The evidence showed V.L.M. wore special shoes and braces, and thus, it was important for her to wear her shoes properly. Oxendine also testified Mother had a delayed response when responding to V.L.M. With respect to whether V.L.M. was bonded with Mother, Oxendine testified Mother and V.L.M. did not hug, kiss, or cuddle during their interactions. Neither reacted to each other and there did not appear to be any bond between them.

The trial court also heard testimony from Mother, who described V.L.M. as a healthy baby at birth. According to Mother, V.L.M. exhibited no problems feeding, sleeping, or moving at birth, and she believed the Department became involved with her family because she missed some doctor appointments. When asked about the genetic testing, Mother testified she did not understand why the "DNA came out the same." She testified at no point did she ever sleep with a family member, and her previous boyfriend, S.S., was V.L.M.'s father. Mother stated she met S.S. at a local grocery store and he was her father's friend. When asked to describe V.L.M.'s diagnoses, Mother testified V.L.M. has a speech problem, but added that V.L.M. walks and runs. She did not know how many prescriptions V.L.M. was taking, nor what the prescriptions were for. When asked specifically about each of V.L.M.'s specialty doctors and surgeries, Mother was able to identify what type of doctors V.L.M. saw and the reasons for V.L.M.'s surgeries; however, Mother also testified she did not believe V.L.M. needed any special type of care. Mother stated that if V.L.M. was returned to her, she would ask the doctor what to do with V.L.M.

When describing her visits with V.L.M., Mother stated she would play with the child and sometimes feed her things like baby applesauce or cookies. As to whether she could handle two

children, Mother testified she could put one to sleep and play with the other or have the children play with each other. Mother stated she believed she could care for V.L.M. better than V.L.M.'s current foster mother because she would give V.L.M. healthy food and make sure she did not miss a doctor's appointment. According to Mother, V.L.M.'s current foster mother fed V.L.M. too many sweets. With regard to her parenting abilities, Mother testified she was receiving assistance through the iParent program, a program that was recommend by the Department. Mother testified she has been doing the iParent classes and she believes she has become a better parent. Mother indicated she kept a notebook to keep track of her younger baby's feeding schedule. Mother also added she no longer interacts with her family, and she has been much happier not communicating with them and living with her current boyfriend, S.C. Mother further stated that S.C., as well as S.C.'s sister, could help her take care of V.L.M. and her other child.

S.C., Mother's current boyfriend and father of her second child, also testified. S.C. testified he was currently living with Mother and their baby. According to S.C., they both care for their baby and help each other with the baby. S.C. also testified he was aware V.L.M. had health problems, but he did not know how serious the problems were. S.C. stated, however, that he believed Mother was a good person who deserved to have her baby back. He also added he was Mother's support system and that he would help her care for V.L.M. if V.L.M. was returned to her.

After hearing the evidence, the trial court signed an order terminating Mother's parental rights to V.L.M. In the order, the trial court found by clear and convincing evidence that termination of Mother's parental rights was supported by section 161.003 of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.003(a)(1)-(5) (West Supp. 2017). Thereafter, Mother filed this appeal.

**ANALYSIS**

In her sole issue on appeal, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's predicate findings that her parental rights should be terminated pursuant to section 161.0003 of the Code. *See id.* Specifically, Mother argues the evidence was legally and factually insufficient to support the trial court's two findings under section 161.003(a) that: (1) she has a mental or emotional illness or a mental deficiency that renders her unable to provide for the physical, emotional, and mental needs of V.L.M.; and (2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render her unable to provide for V.L.M.'s needs until V.L.M.'s 18th birthday. *See id.* § 161.003(a)(1),(2).

*Standard of Review*

A parent's rights to the care and custody of his or her child are constitutional in nature; however, these rights are not absolute. *In re E.A.G.*, 373 S.W.3d 129, 140 (Tex. App.—San Antonio 2012, pet. denied) (citing *Santosky v. Kramer*, 455 U.S. 745, 758-59 (Tex. 2003)). In an involuntary parental termination proceeding, the State can seek to permanently divest a parent of all their legal rights and duties to his or her child. TEX. FAM. CODE ANN. § 161.206(b); *E.A.G.*, 373 S.W.3d at 140; *In re L.G.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.). Because the involuntary termination of parental rights raises due process concerns as it results in permanent and unalterable changes for both parent and child, the State bears the burden of proving the elements necessary for termination by clear and convincing evidence. *In re F.E.N.*, 542 S.W.3d 752, 761 (Tex. App.—Houston [14th Dist.] 2018, no pet.). "Clear and convincing evidence" is defined as "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

When reviewing the legal and factual sufficiency of the evidence, we apply the well-established standards of review. *See id.* §§ 101.007, 161.206(a); *see also In re J.P.B.*, 180 S.W.3d

570, 573 (Tex. 2005) (legal sufficiency); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (factual sufficiency). Under these standards, we must determine whether the evidence is such that the trier of fact could reasonably form a firm belief or conviction that termination was in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "The trial court is the sole judge of the weight and credibility of the evidence, including the testimony of the Department's witnesses." *In re F.M.*, No. 04-16-00516-CV, 2017 WL 393610, at *4 (Tex. App.—San Antonio Jan. 30, 2017, no pet.) (mem. op.).

*Applicable Law*

Termination of the parent-child relationship is permitted under section 161.003(a) of the Code. *See* TEX. FAM. CODE ANN. § 161.003(a). To support termination under this section, the Department must prove by clear and convincing evidence that:

(1) the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child;

(2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;

(3) the department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination held in accordance with Subsection (c);

(4) the department has made reasonable efforts to return the child to the parent; and

(5) the termination is in the best interest of the child.

*Id.*

As indicated above, Mother challenges the sufficiency of the evidence to support only the trial court's first two findings that (1) she has a mental or emotional illness or a mental deficiency that renders her unable to provide for the physical, emotional, and mental needs of V.L.M., and

(2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render her unable to provide for V.L.M.'s needs until V.L.M.'s 18th birthday. *See id.* § 161.003(a)(1),(2). With regard to the first finding, a parent's mental illness or incompetence is not, in and of itself, grounds for termination of the parent-child relationship. *In re B.J.C.*, 495 S.W.3d 29, 36 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *In re E.R.N.*, No. 04-11-00161-CV, 2011 WL 5069423, at *2 (Tex. App.—San Antonio Oct. 26, 2011, no pet.). However, when a parent's mental state causes him or her to engage in conduct that endangers the physical or emotional well-being of the child, then the conduct has a bearing on the advisability of terminating the parent's rights. *In re B.J.C.*, 495 S.W.3d at 36; *In re E.R.N.*, 2011 WL 5069423, at *2. Thus, "[t]here must be evidence to support a determination that a parent's mental illness or deficiency excludes her from providing for her children now and in the future." *In re B.J.C.*, 495 S.W.3d at 36. As to the second finding, "'[i]n all reasonable probability' does not mean beyond a reasonable doubt and does not require 'scientific certainty' that the parent's mental illness will continue until the child is [eighteen]." *Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 791 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

### *Application*

In this case, the evidence shows Mother has an IQ of 58 and a limited understanding of V.L.M.'s special medical needs. The trial court heard testimony from several witnesses, including Mother's counselor, Martinez, who expressed concern regarding Mother's decision–making abilities. Two witnesses — Martinez and Dr. Hernandez — testified they evaluated Mother and believed Mother did not have the mental capacity to care for V.L.M. Each specifically testified as to their concern regarding Mother's ability to handle V.L.M.'s special needs, stressing Mother was unable to describe V.L.M.'s current medical issues and provide a detailed medical history to V.L.M.'s doctor. By Mother's own testimony, she was unable to fully describe V.L.M.'s medical

issues. When asked what she would do if V.L.M. was returned to her, Mother indicated she would simply ask the doctor. However, the trial court heard testimony from V.L.M.'s pediatrician, Dr. Mazer, who stated Mother did not participate in the appointments the way a parent should. Dr. Mazer expressed concern regarding Mother's abilities to parent V.L.M., highlighting that Mother was unable to answer pointed questions about V.L.M.'s needs and development. Moreover, the trial court heard evidence from Oxendine, a Department caseworker, who testified Mother struggled to change V.L.M.'s diaper and feed V.L.M. There was further evidence Mother was not bonded to V.L.M. and did not express emotion toward V.L.M. Accordingly, we hold that based on the evidence, the trial court could have reasonably formed a firm belief or conviction that Mother had a mental deficiency that rendered her unable to care for V.L.M.'s needs. *See* TEX. FAM. CODE ANN. § 161.003(a)(1); *In re B.J.C.*, 495 S.W.3d at 36.

In addition, the trial court also heard evidence regarding Mother's ability to parent V.L.M. in the future. The evidence showed that over the course of a year and after ongoing counseling and parenting classes, Mother was unable to fully understand V.L.M.'s needs or identify V.L.M.'s father. The evidence shows Mother exhibited cognitive distortions, such as denial and minimization, making it challenging for her to change her behavior in anticipation of V.L.M.'s possible return. Mother's counselor described Mother's progress as positive, but slow, and indicated Mother would be unable to make enough progress to care for V.L.M. within the next 90 days. The trial court heard testimony from several witnesses, who stated Mother would need assistance in caring for V.L.M. And although Mother and S.C. disagreed Mother needed help and testified Mother was currently caring for her second child by keeping track of feedings in a notebook, there was evidence that Mother's developmental delays would continue to impede her progress as well as V.L.M.'s development. Dr. Mazer specifically testified she was concerned about Mother's developmental delays because it was important for V.L.M. to have someone to

model her behavior after. Accordingly, the trial court could have reasonably determined that in all reasonable probability, Mother's mental deficiency would render her unable to provide for the V.L.M.'s needs from now until V.L.M. reached majority. *See* TEX. FAM. CODE ANN. § 161.003(a)(2); *In re B.J.C.*, 495 S.W.3d at 36.

Based on the foregoing, we conclude the evidence is both legally and factually sufficient to support the trial court's findings that Mother's mental deficiency renders unable to provide for V.L.M.'s needs, and, in all reasonable probability, the mental deficiency from which Mother suffers will continue to render her unable to provide for V.L.M.'s needs until her 18th birthday.

### CONCLUSION

Based on the evidence before the trial court, we hold the trial court did not abuse its discretion in finding termination was proper. Accordingly, we affirm the trial court's order of termination.

Marialyn Barnard, Justice