**Affirmed and Memorandum Opinion filed April 22, 2021.**



In The

# Fourteenth Court of Appeals

## NO. 14-20-00742-CV

## IN THE INTEREST OF A.M.W. A/K/A A.W., K.R.W. A/K/A K.W., CHILDREN

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2019-03213J**

## MEMORANDUM OPINION

In this appeal from the termination of parental rights of both Mother and Father to their children, Daughter and Son, each parent challenges the factual sufficiency of the evidence to support the trial court's findings that termination was in the best interests of the children. We affirm.

### I. STANDARD OF REVIEW AND LEGAL PRINCIPLES

A court may terminate the parent-child relationship if the court finds by clear and convincing evidence that (1) the parent has engaged in at least one statutory predicate act and (2) termination is in the best interest of the child. *In re*

*N.G.*, 577 S.W.3d 230, 230 (Tex. 2019); *In re L.C.L.*, 599 S.W.3d 79, 83 (Tex. App.—Houston [14th Dist.] 2020, pet. filed) (en banc); *see* Tex. Fam. Code § 161.001(b).

Termination of the parent-child relationship is a drastic remedy and is of such weight and gravity that due process requires the state to justify termination by clear and convincing evidence. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *see also In re L.G.R.*, 498 S.W.3d 195, 201 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Fam. Code § 101.007. This heightened burden of proof results in a heightened standard of review when evaluating the sufficiency of the evidence. *In re L.G.R.*, 498 S.W.3d at 202. Evidence is factually insufficient if, in light of the entire record, "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed evidence in favor of its findings if a reasonable factfinder could do so, but we do not disregard disputed evidence. *See In re Commitment of Stoddard*, No. 19-0561, 2020 WL 7413723, at *6 (Tex. Dec. 18, 2020).

The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship. *In re B.J.C.*, 495 S.W.3d 29, 35 (Tex. App.—Houston [14th Dist.] 2016, no pet.). But there is also a presumption that the permanent placement of a child in a safe

environment is in the child's best interest. Tex. Fam. Code § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d at 39 (noting that the child's need for permanence through the establishment of a stable, permanent home is the paramount consideration in a best-interest determination). The best-interest analysis is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).

In assessing whether the evidence is sufficient to prove that termination is in the best interest of a child, we may consider the non-exclusive factors discussed in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (1976). *See In re E.C.R.*, 402 S.W.3d 239, 249 & n.9 (Tex. 2013). These factors include (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.* (citing *Holley*, 544 S.W.2d at 371–72). We may also consider the statutory factors in Section 263.307 of the Family Code, including the children's ages, the parents' history of substance abuse, the willingness and ability of parents to accept counseling services and to cooperate with the state's supervision, whether the parents demonstrate adequate parenting skills, and the results of psychiatric, psychological, and developmental evaluations. *See In re A.R.M.*, No 14-13-01039-CV, 2014 WL 1390285, at *9 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (citing Tex. Fam. Code § 263.307(b)).

## II.   THE EVIDENCE

The trial in this case took place by video conference over three days in September and October 2020.  Although the parents' attorneys attended, neither parent was present at trial.[1]  The Department presented testimony from two witnesses: the caseworker and the guardian ad litem.

### A.   Initial Department Involvement and Removal of Children

The caseworker testified that Mother and Father were married and living together although Father did not live in the home the entire time after June 2020.  Through a "parent child safety" placement, the children began living with caregivers outside of the parents' home in May 2019.  At the time of removal from the parents' care, Daughter was three years old and Son was about eighteen months.  The caseworker testified that the Department first became involved because of neglectful supervision by the parents.  It was alleged that the children were not fed or cleaned and that Mother sat in her room and left the children to care for themselves.  Mother had a prior diagnosis of anxiety and depression.  Drug paraphernalia was observed in the home within the children's reach and there were concerns of "constant foot traffic" in the home.  The Department was appointed temporary managing conservator in September 2019.

### B.   Children's Development Before Removal

The caseworker testified that, at the time of removal, it was alleged the children had not been properly cared for and were developmentally behind.  The guardian ad litem testified that Son was not eating solid foods and only took a bottle.  He had a speech delay and was "tongue-tied," such that he underwent surgery on his tongue after being taken into the Department's care to facilitate his

---

[1] Before the second day of trial commenced on September 16, 2020, the judge announced that he had checked the courtroom and hallway and that no one was present.

speech development. Son was "very developmentally behind" when he first came into the Department's care. Initially, an evaluator thought Son was autistic, but they later concluded that he was simply lacking experiential learning. Daughter similarly had speech delays and was not meeting developmental milestones. Daughter would eat with her hands, was unfamiliar with utensils, and would hoard food.

## C.    Family Service Plans

The caseworker testified that the parents signed family service plans that were made orders of the court. The trial court admitted the service plans as exhibits. Mother's service plan identified the following required actions:

- Maintain stable, sanitary housing and legally verifiable employment.

- Participate in and successfully complete a substance abuse assessment and follow all recommendations which may include substance abuse therapy.

- Continue to receive medical attention to treat her mental health needs.

- Attend and successfully complete parenting classes.

- Maintain contact with her caseworker and participate in court hearings.

- Refrain from criminal activity and violence.

- Submit to random drug testing, including urine analysis, hair follicle tests, or extended drug panels. "Failure to completed [sic] the scheduled drug screening will result in a [sic] automatic positive."

Father's service plan identified the following required actions:

- Maintain stable, sanitary housing and legally verifiable employment.

- Complete thirteen units of individual substance abuse sessions and twenty-four units of group substance abuse counseling.

- Be randomly drug tested weekly, submit to drug or alcohol screenings upon request, test negative for drugs and alcohol, and refrain from drug use. "Any refusal of drug/alcohol testing will be considered as testing positive. Any missed appointments will be considered as testing positive."

- Participate in and successfully complete a full psychosocial assessment to assess his emotional and mental needs.

- Maintain contact with his caseworker and participate in court hearings.

- Refrain from criminal activity.

- Complete a psychiatric evaluation.

- Attend and successfully complete parenting classes.

- Attend eight units of family counseling with Mother.

**D.   Drug Use and Testing**

According to the family service plans, the parents had a history with drugs. Mother admitted that her drug of choice was marijuana and that she also used cocaine. Father admitted to using marijuana recreationally and also meth and cocaine. Both parents tested positive for drugs during the Department's investigation. The caseworker testified that although the parents participated in court-ordered drug testing, neither parent complied with the weekly drug testing requirement of the service plans. The last drug test that Mother complied with occurred in February 2020. The last drug test that Father complied with occurred in June 2020. He also tested positive for cocaine in June 2020. He told the caseworker that maybe someone "put something in his drink."

**E.  Domestic Violence During Pendency of Case**

The caseworker testified about two incidents of domestic violence occurring in March and June 2020.  Although the parents told the caseworker the first incident was only a verbal altercation, their therapist told the caseworker a different story.  During the first incident, the parents pushed each other, and father sustained a head injury requiring stitches.  The police were called, and Father was taken to a hospital.  The parents provided information about the second incident to the caseworker. The second incident involved a "physical altercation" for which the police were called to the home; they had to escort Father from the home.

**F.  Lack of Support and Failure to Visit Children**

The caseworker testified that both parents were ordered to pay child support, but neither parent paid any support.  The parents did not consistently visit their children during the scheduled bi-weekly visits that were being held virtually due to the COVID-19 pandemic.  The last visitation the parents attended before the trial in September and October 2020 was in July 2020.  Four visitations had been scheduled since then that the parents did not attend.  The parents did not call or contact the caseworker to inquire about the children's well-being.  The guardian ad litem testified that Mother did not really know how to engage with the children during virtual visits.  Mother would "just randomly call out" names.  The caseworker described a virtual visit with Father when he was playing a video game on a gaming system during the virtual visit.  Father would "stick his head in the picture every once in a while" to say, "Hello," and then get out of the picture and continue gaming.  The caseworker believed Father was more interested in gaming than talking to Daughter.

**G.      Desires of the Parents and Failures to Attend Trial**

During an unannounced home visit on the day before the trial commenced, the caseworker spoke with both parents to remind them of the hearing. Mother told the caseworker that she had signed a relinquishment for the children, although Mother's attorney told the caseworker that Mother had not signed it. Father told the caseworker that he wanted Daughter to be placed with Father's sister and for Son to stay in his current placement. The caseworker also texted Mother on the day before the second day of trial to remind her of the proceeding, and Mother responded "okay." As mentioned above, the parents did not attend any of the three days of the trial.

**H.      Additional Failures to Comply with Service Plans**

The caseworker described additional failures by the parents to comply with the service plans. In particular, the parents did not complete substance abuse counseling, domestic violence courses, or family therapy. Although Mother completed parenting classes, Father did not. Mother was not compliant with seeing a psychiatrist or completing individual therapy. Mother provided no excuse to the caseworker as to why she did not complete the family service plan.

**I.      Phone and Internet Issues**

The caseworker testified that when she spoke with Mother about missing visitations, Mother told the caseworker that her phone was off and she could only connect to Wi-Fi; she had no way of getting in contact with anybody. Mother told the caseworker that she had some phone and internet "issues." Similarly, Father told the caseworker that his phone was off and he had no way of getting in contact with anyone.

The caseworker testified, however, that Mother had relatives in the Houston area, including Mother's mother, who had internet service and had been participating in the bi-weekly virtual visits with the children. The caseworker testified, therefore, that Mother could have easily seen the children during virtual visits despite the claimed internet "issues." Moreover, the parents did not have these internet issues until July 2020, but neither parent consistently participated in their virtual substance abuse or therapy services before July 2020.

## J.      Development of the Children After Removal and Plans for Adoption

By the time of trial, the children were placed in separate homes. Daughter was living with fictive kin caregivers and her older half-brother, who had also been removed from Mother's care and was the subject of a separate termination proceeding. Son was living with a relative. The caregivers for both children were friends with each other and were willing to adopt the children. The Department's goal for the children was adoption. The caseworker testified that there would be no barriers to the children being adopted in their current placements if the court terminated the parents' rights.

The caseworker and guardian ad litem testified that the children were doing very well in their placements. The children have progressed developmentally on all levels. Son is in speech therapy, which the caregivers are facilitating. The children are "very closely bonded" with their caregivers, and Daughter is very bonded with her older half-brother with whom she now lives.

## K.      Desires of the Children

The caseworker testified that Son was not of age to ask about his parents. Daughter asked about them at the first missed visit, but since then has not asked about her parents when the Department facilitated visits with the siblings.

9

## III. ANALYSIS

Mother and Father acknowledge that the evidence is legally and factually sufficient to support the predicate grounds for termination and that the evidence is legally sufficient to support the trial court's findings that termination is in the children's best interests. But Mother contends that the evidence is factually insufficient to support the best interest findings because the Department failed to present testimony from any caregiver or the children and failed to offer the results of developmental and psychological assessments of Daughter. Mother also notes that her absence at trial may have been due to "technology challenges," but Mother acknowledges that this issue "was not addressed" at the hearing. Father contends that the evidence is factually insufficient because "the plans for the children remain unknown," and there was no evidence about the financial stability and state of health of the individual caregivers or their families. Father contends that, due to the COVID-19 pandemic, "the state of health of each caregiver (and their immediate families) require greater exploration at the trial court level."

### A. Children's Desires and Needs, Department's Plans for the Children, and Stability of Proposed Placement

There is no direct evidence about the desires of the children, but the trial court appropriately considered evidence that the children have bonded very well with their new caregivers, Daughter is living with and bonded to her half-brother, and the children have been well-cared for by the caregivers and are progressing developmentally. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Contrary to Father's contention that the plans for the children remain unknown, the trial court heard evidence that the plans for the children are adoption by their current caregivers, that termination would facilitate adoption by the

10

current caregivers, and that the children were thriving with their new caregivers. This evidence is relevant to the best interests of the children. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (reversing court of appeals when the lower court held that the evidence was factually insufficient in part because the caregivers did not testify). The Department adduced this evidence without testimony from the caregivers or children, and Mother's contention that the caregivers or children had to testify is unsupported. The health and financial security of the caregivers was not placed at issue during the trial. Evidence that the children's conditions improved while in the caregivers' custody supports the trial court's best-interest findings. *See In re T.T.*, 228 S.W.3d 312, 321–24 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

These factors weigh in favor of the trial court's best interest findings.

**B.** **Emotional and Physical Danger to the Children, Parents' Abilities, Assistance Programs, Instability of the Home, and Acts or Omissions of the Parent Indicating the Parent-Child Relationship is Inappropriate**

The parents acknowledge on appeal that their failures to follow the service plan weigh in favor of the trial court's best interest findings. *See In re I.L.G.*, 531 S.W.3d 346, 355–56 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). The parents' failures to complete the services required and to take advantage of assistance programs offered by the Department—therapy, substance abuse counseling, and domestic violence courses—casts doubt on their parenting abilities. *Id.* at 356. The failure to comply with the service plan is an omission indicating that the existing parent-child relationship is inappropriate. *See Z.A.R. v. Tex. Dep't of Family & Protective Servs.*, No. 14-20-00511-CV, 2020 WL 7866800, at *14 (Tex. App.—Houston [14th Dist.] Dec. 31, 2020, pet. denied) (mem. op.). The parents' failures to pay court-ordered child support suggest an inability to provide for the children's physical needs. *See In re H.G.H.*, No. 14-06-

11

00137-CV, 2007 WL 174371, at *5 (Tex. App.—Houston [14th Dist.] Jan. 25, 2007, no pet.) (mem. op.) (considering lack of financial support in best interest analysis).

The parents' history of substance abuse and failure to comply with drug testing further support the trial court's findings. *See In re E.W.*, No. 14-19-00666-CV, 2020 WL 742327, at *9 (Tex. App.—Houston [14th Dist.] Feb. 13, 2020, pet. denied) (mem. op.); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Substance abuse can negatively affect parenting abilities and shows instability in the home environment. *Z.A.R.*, 2020 WL 7866800, at *13. The parents' substance abuse indicates a present and future emotional and physical danger to the children. *See id.* at *14; *see also In re T.N.J.J.*, No. 04-19-00228-CV, 2019 WL 6333470, at *5 (Tex. App.—San Antonio Nov. 27, 2019, no pet.) (mem. op.) (reasoning that father's "drug use and his failures to submit to drug testing and participate in drug treatment during the pendency of this case are relevant to multiple *Holley* factors, including the emotional and physical needs of the children now and in the future, the emotional and physical danger to the children now and in the future, [father]'s parental abilities, the stability of [father]'s home, and the acts or omissions which may indicate the existing parent-child relationship is not a proper one"). There was drug paraphernalia in the home that the children had access to.

Continued domestic violence between the parents supports the trial court's findings. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *19 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied). Domestic violence endangers the children's well-being. *See Z.A.R.*, 2020 WL 7866800, at *13. Similarly, Mother's failure to treat her depression and anxiety by participating in

therapy may endanger the children. *See In re F.M.E.A.F.*, 572 S.W.3d 716, 737 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). And, the parents' failures to consistently attend scheduled virtual visits with the children are acts and omissions indicating an improper parent-child relationship or an inability to parent the children. *See In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *8 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.); *In re S.N.*, 287 S.W.3d 183, 192–93 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

These factors weigh in favor of the trial court's best interest findings.

## C. Parent's Excuses and Plans for the Children

As the sole judge of the credibility and weight of the evidence, the trial court could have rejected the parents' excuse of having "issues" with phone and internet. *See A.S. v. Tex. Dep't of Family and Protective Servs.*, 394 S.W.3d 703, 716 (Tex. App.—El Paso 2012, no pet.). Although the parents' issues allegedly began in July 2020, the parents failed to attend virtual services such as therapy and substance abuse assistance before July 2020. The caseworker testified that Mother had family support that could assist with the virtual visits. Mother acknowledged receipt of a text message informing her of the second day of trial, yet she failed to attend. Both parents were informed of the first trial date in person yet failed to attend. Rather than attend the trial, Mother told the caseworker of her intent to relinquish her rights, and Father told the caseworker that the children should live with others.

These factors weigh in favor of the trial court's best interest findings.

## IV. CONCLUSION

After considering the entire record in light of the factors discussed above, we conclude that a factfinder could reasonably have formed a firm belief or conviction

13

that termination was in the children's best interests. The parents' issues are overruled. The trial court's final decree for termination is affirmed.


/s/     Ken Wise
        Justice


Panel consists of Justices Wise, Zimmerer, and Poissant.