

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00002-CV
_____

IN THE INTEREST OF I.M. AND A.M., CHILDREN

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2016-2149-DR

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

Mother appeals the trial court's decision to terminate her parental rights to her two daughters, Isabelle and Amy,[1] on the ground that she was unable to care for her children due to a mental or emotional illness or mental deficiency.[2] *See* TEX. FAM. CODE ANN. § 161.003. On appeal, Mother argues that the evidence was insufficient to permit the trial court to modify a prior order denying termination of her parental rights because there was no material or substantial change in the parties' circumstances since the date of the trial court's prior order. Mother also argues that res judicata and collateral estoppel barred the trial court from modifying the prior order. Because we conclude that sufficient evidence supported the trial court's judgment and that Mother failed to preserve her claims of res judicata and collateral estoppel, we affirm the trial court's judgment.

*(1)*　*Factual and Procedural Background*

　　*a.*　*The Prior Proceeding*

In 2016, the Department of Family and Protective Services (Department) filed a petition to terminate Mother's and Father's parental rights, when Isabelle was one year old and Amy was four months old. The trial court referred the case to mediation, and a binding mediated settlement agreement (MSA) resulted.[3] Pursuant to the MSA, Mother and Father agreed that the

---

[1]We refer to all parties by pseudonym to protect the identity of the children. *See* TEX. R. APP. P. 9.8(b)(2).

[2]The trial court also terminated Father's parental rights after he signed an affidavit of relinquishment of his parental rights. Father is not a party to this appeal.

[3]The MSA provided that the parties agreed "to release, discharge and forever hold the other harmless from any and all claims and causes of action that have been alleged or could have been alleged in the above entitled and numbered

2

Department would be designated as permanent managing conservator of the children, that Mother would pay for and have a monthly, two-hour visitation with the children at Gregg County Getting Together Safely, and that Father would have the same visitation schedule after providing two negative drug tests. Mother and Father also both agreed to pay child support based on minimum wage guidelines and to undergo "random drug testing pursuant to the service plan." As a result of the MSA, the trial court entered a final order in 2018 (Prior Order), incorporating the MSA's terms.

b.  This Proceeding

More than a year later, the Department filed a petition to modify the trial court's Prior Order by terminating Mother's parental rights on several grounds specified in Section 161.001(b)(1) of the Texas Family Code and on the ground in Section 161.003 that Mother had a mental or emotional illness or mental deficiency that rendered her unable to provide for her children. Although the grounds alleged in the Department's petition were the same grounds that were previously alleged in its prior petition, the Department stated that the circumstances of a party affected by the Prior Order had "materially and substantially changed since the date that the [Prior] [O]rder was entered." It was uncontested that, since the Prior Order, Father had signed an affidavit of relinquishment of his parental rights to Isabelle and Amy.

At trial, several witnesses testified about Mother's mental health. Dan Boynton, a psychologist who evaluated Mother in 2017 when she was twenty-two, testified that she was diagnosed with delusional disorder and bipolar II disorder. Boynton said that Mother claimed to

cause." It was signed by all parties and said, "THIS AGREEMENT IS NOT SUBJECT TO REVOCATION AND IS ENFORCEABLE AS A CONTRACT."

3

hear her deceased father's voice but that she denied auditory and visual hallucinations. As a result, Boynton said that it was unclear if Mother was hearing "something that was a religious nature to her or if she [claimed to be] hearing and speaking to her father." Even so, Boynton testified that he was concerned that Mother's mental condition could affect her ability to raise children if she did not take her medication properly. Boynton clarified that Mother's noncompliance with orders to take medication would have a negative impact on her ability to parent because "[t]here would be times where [she] would think things were happening that weren't." Boynton also said that Mother's response to internal stimuli meant that her condition was getting worse.

In addition to Boynton's testimony about Mother's earlier condition, the Department called Frank Stuart Murphy, a psychiatrist for Community Healthcore, who began seeing Mother in 2019, after the Prior Order was entered. Murphy testified that he treated Mother for recurrent depressive disorder with psychosis and uncomplicated psychoactive substance abuse and said that she was diagnosed with schizotypal personality disorder. Murphy explained that Mother's depressive disorder was "severe enough to cause psychosis, which means problems with reality testing, usually manifest[ing] as hallucinations or delusions." Murphy also said that people with schizotypal personality disorder "don't understand how relationships form or the impact of their behaviors on others" and that this was "likely something that [Mother] would deal with for the rest of [her] life." As a result of her mental illnesses, Murphy said that Mother "always seems distant and unrelated" and would "not live in our reality or live in the fringes of our reality at best." According to Murphy, Mother had "remained the same with periods of exacerbations and

remissions" since coming to Community Healthcore and did not seem significantly better. Murphy testified that Mother was taking an antidepressant, antipsychotic, and mood stabilizer; that he would have concerns for her children's safety if she was not medication compliant; and that he was also worried because "she admitted to [him] that she is easily influenced by others."[4] When asked if Mother could completely recover from her mental condition, Murphy said, "Well, as a clinician and scientist, I have to say yes. It's within the realm of possibility. I don't think it's likely, but it is possible . . . . I haven't seen any evidence of improvement in the last four years to suggest that, but still it could happen."

Kristi Prince, a qualified mental health professional with Community Healthcore, testified that she had been working with Mother for two years. Prince also said that "[Mother] ha[d] a schizotypal personal disorder" and a "major depressive disorder" that was "severe with psychotic symptoms." Even so, Prince said "usually [Mother] denies any psychotic symptoms" because "[s]he doesn't ever admit up to anything" but that she "notice[d] that [Mother] responds typically to internal stimuli, meaning she may hear voices," and engages in "inappropriate laughter, which would indicate that she was listening somewhere else and not to you." According to Prince, Mother had "cognitive deficits, so extreme difficulty with remembering and retaining information," which was demonstrated by "follow[-]up sessions[ in which Mother] wouldn't be able to recall what [was] talked about the previous week."

Prince said Mother would have a chance of improvement if she "put in the work and was med compliant" but testified that she had not seen Mother improve over the course of two years

___

[4]According to Mother's medical records, which were admitted at trial, Mother reported to mental health professionals who questioned her after the entry of the Prior Order that she was not taking her medication.

and that Mother, who had a history of not taking medications as prescribed, had difficulty remembering to take oral medication. When asked if Mother's mental health remained the same, Prince said, "At times it has been I would say on a decline, but for the majority of the time it's kind of plateaued." Prince clarified that Mother had not made any progress on basic life skills, needed help grocery shopping, had a person to help her pay simple bills, could not understand that she had received a parking ticket, and that, without hands-on assistance, Mother probably would not make it to doctor appointments.

Prince provided several examples of other behaviors that alarmed her, including that Mother, who was on a fixed disability income, gave away her money and allowed people to take advantage of her. Prince said that Mother let someone borrow $200.00 in April 2019, that the money was never returned to her, and that Mother told Prince she could not pay rent as a result. Prince testified, "Each time that I've been inside of [Mother's] home, what I've noticed is that furniture is disappearing so I'm assuming she's giving away her furniture." According to Prince, Mother allowed someone to take her vehicle from her apartment complex, and the person did not bring it back until sometime later. Even so, Mother later let a homeless person borrow her car in 2019 in Houston, and the person stole her car, which was never found. Also in 2019, Prince walked into Mother's apartment to find a man that Mother did not seem to know well sleeping on the floor. Mother said she allowed him to stay since he had told her he had no other place to go. Prince testified that Mother did not own a weapon, but that there was a handgun with a clip out in the open when the man was there. Prince also said, "There was an incident with a broken window . . . [Mother] was never clear with . . . what had happened. I know it was a bullet hole,

and I know that it was replaced." Prince also said that Mother took her smoke alarm detector off her ceiling when it started beeping, did not have the battery replaced, and never reattached the detector. Mother also told Prince that gambling was the reason why she missed a court date in March 2019, and Prince said Mother expressed no desire to pay child support.

Prince testified that it would concern her if Mother had children in the home because she "makes very poor choices," which would make it hard to take care of children appropriately. Prince said that she would not leave a child alone with Mother even for an hour. She testified that "having other people or strangers around your children . . . could put your children in danger."

Monica Writt, a conservatorship caseworker for the Department, testified that the Department received a referral in 2016 because there were concerns that Mother, who was living in a shelter, was leaving Isabelle and Amy unattended and could not care for them. According to Writt, Mother was confused, disoriented, and paranoid during their first meeting. Writt testified that Mother completed court-ordered services but struggled with demonstrating that she learned from them and that her parenting skills and mental health did not improve. Writt testified that Mother was living with strangers, that she had concerns about Mother's drug use, and that Mother never entered a drug-treatment program. Writt believed there were safety concerns because Mother could "not recall things such as locking the door, feeding the children, knowing . . . what's an age[-]appropriate toy," had a hard time concentrating, and would "zone out" during visits with the children. Writt testified that she attended the mediated settlement meeting and that the Department expected her to visit the children and assist financially. Now, Writt

believed that termination of Mother's parental rights and adoption by the children's foster parents was in the children's best interests.

Mother, who was twenty-five at trial, said that, at that time, Isabelle was five and Amy was four and that they had been in the same foster home since 2016 and were doing well because the foster home was meeting their needs. Mother testified that she agreed to the MSA in June 2018 and that the MSA was in the children's best interests. Mother testified that she had agreed to pay $280.00 in child support per month, but never did, even though she had $300.00 per month after expenses to spend as she liked.[5] Mother also understood that she had agreed to have visitation at Getting Together Safely and that she was responsible for the cost but admitted to missing several of those visits. Even though she was allowed monthly visitation, Mother had seen the children only three times between the entry of the Prior Order and the September 2019 filing of the Department's modification petition. Mother testified that she stopped visitation because she missed the bus. After the Department's petition in this case was filed, Mother had eight opportunities to see her children but missed three visits because she was "having a hard time."

Mother testified that she was disabled due to her bipolar disorder, began hearing her father talk back to her from heaven after the Prior Order was entered, and was diagnosed with a different mental health issue two years before the June 24, 2020, hearing. Mother said that Prince, her Community Healthcore case manager, helped her with groceries and that she had a

---

[5]Mother said that she received "807, 800" from disability payments, that, for the last two years, she lived in an apartment provided by Community Healthcore and that she paid $133.00 in rent for that apartment. Mother said that she paid her helper $43.00 to manage her money, that her helper paid Mother's $60.00 electric bill and gave her a $100.00 allowance for food, and that she received $194.00 in food stamps.

person that helped her manage her money. In August 2018, Mother said that she had ripped her smoke detector off the wall because it was beeping and that she did not change the battery because "the battery goes out real quick." Mother admitted that she let a homeless man borrow her car in August 2019 because she trusted him and that he stole the car. Mother also admitted that she had used a controlled substance after she signed the MSA, but still believed that it was not in the children's best interests for her parental rights to be terminated.

Camilla M. Jones, a licensed professional counselor, attended Mother's visits with Isabelle and Amy at Getting Together Safely beginning in September 2018. Jones said that, while Mother demonstrated her love for the children during visits, she lacked connection with them, did not understand their needs, and needed "an ongoing interpreter . . . to help her . . . engage with her children," even during a short period of time. According to Jones, there was no natural type of engagement typically seen between parent and child, Mother would "just kind of zone out," and her flat affect would alarm the children when they tried to engage her. Jones said that Mother would become distracted and would disassociate herself to pay attention to her phone.

Jones said that, based on her observations, there was no motherly connection or even close friendship with the children and no bonding occurred during the visits. As a result, while the children were not harmed by these visits, they "didn't make sense to [the children]" and confused them. Jones testified that she saw no benefit for the children to have contact with Mother and that continued visits could be harmful to the children because it would just produce more questions as to why the children were essentially engaging in a play date "with someone

that they're not attached to with a third party" present. Jones was aware of the Department's many programs but was not aware of any program or situation that would make her feel comfortable leaving the children with Mother unsupervised. Jones said that she observed only four visits, because Mother missed the fifth and no more visits were scheduled.

Jones testified that the children have a loving, warm relationship with their foster parents, who gave them much physical affection, and that it would be traumatic to remove them from the foster home. She said that Isabelle and Amy were happy and healthy and had no special needs. According to Jones, termination of Mother's parental rights and adoption by the foster family was in the children's best interests.

Ariel Angel, a permanency caseworker for the Department, became involved in September 2018 after the Prior Order was entered. Angel said that Mother was "participating in programs out-patient and on the mental health side" when she was assigned and that the Department was encouraging her to continue services to try and mitigate the reasons for separating her from the children.[6] Angel testified that she checked on Mother's status with Community Healthcore and encouraged her to keep participating in programs if she was not doing so. Yet, Angel had no confidence that Mother understood what she explained to her and said she had to have the same conversations over and over. Angel said she saw no improvement in Mother.

Angel said that Mother could have scheduled fourteen visits at Getting Together Safely, but only attended four, which she opined was not enough to maintain sufficient contact with the

---

[6]Angel said that a family service plan for continued services was entered after the Prior Order for Mother, presumably due to negotiations during the mediation.

children.  Angel said that Isabelle and Amy knew who Mother was but did not have a mother-child relationship with her.  Since the modification case was filed in 2019, Angel said the Department made no effort to reunify and did not ask Mother to complete services but scheduled visits with the children.  Angel said that Mother only attended five of eight visits scheduled by the Department, that she was concerned because "[t]here was minimal interactions with the girls unless she was prompted" at these visits, and that the level of interaction did not improve with time.  As a result, Angel testified that Mother did not develop a connection with the children, who were confused when left with Mother alone.

When asked what material change in circumstances had occurred since the Prior Order, Angel said that neither parent had followed through with their agreements in the MSA and that Mother tested positive for cocaine use in November 2018.  Angel also believed that a material change was shown in Mother's and children's "interactions through the visits [because] . . . [t]here [had not] been any improvements in it."  She also said that the children were getting older and "[it was] becoming more confusing to them" to visit Mother.

Angel testified that the children were in ongoing counseling but had no special needs or disabilities.  Angel said that the children viewed the foster parents as their mom and dad and believed it would be emotionally detrimental to continue with Mother's visits.  Angel noted that the foster parents provided for the children's physical and medical needs and believed that termination of Mother's parental rights and adoption was in Isabelle's and Amy's best interests.

11

Wilma, the children's foster mother, testified that there was no contact between Mother and the children from June 2018 to October 2018.[7]  Wilma said that Mother visited the children in October, was late for a November 2018 visit, and scheduled the next visit for February 2019 but did not show up.  According to Wilma, Mother did not visit again until August 2019.  Wilma wanted to adopt Isabelle and Amy and believed it was in the children's best interests for Mother's parental rights to be terminated.

After hearing this evidence, the trial court entered a judgment that terminated Mother's and Father's parental rights and appointed the Department permanent managing conservator of Isabelle and Amy.  In its judgment and by a separate letter ruling, the trial court clarified that Mother's parental rights were terminated pursuant to Section 161.003 of the Texas Family Code.

Mother filed a motion for new trial that challenged the sufficiency of the evidence to support termination under Section 161.003, argued that the Department failed to prove a material and substantial change of circumstance sufficient to justify a modification of the trial court's Prior Order, and, for the first time, contended that the trial court abused its discretion by failing to enforce the MSA.  During a hearing on the motion, Mother raised the novel issue that the Department's modification was barred by res judicata and collateral estoppel since it had raised the same grounds for termination in the prior suit, which was resolved by the MSA.  The trial court denied the motion for new trial.

---

[7]The foster parents intervened, but their pleading and facts related to the intervention are not relevant to the analysis before us.

12

On February 1, 2021, the trial court entered findings of fact and conclusions of law. Our review of Mother's appellate brief shows that she did not challenge the following relevant findings:

- "From the time the 2016 case initiated until it resolved by order of this Court in 2018, . . . [Mother] was unable to demonstrate that she had learned from the services[,] . . . [and her] mental condition did not improve over that period of time."

- In the Prior Order, "[Mother] was ordered to have visits with her children at Getting Together Safely."

- "From June 2018 through September 2019, [Mother] visited the children on 3 or 4 occasions."

- "During the pendency of this case, [Mother] missed 3 of her 8 visits with the children."

- "During visits with the children in 2018, [Mother] was unable to attend to the children's needs or recognize when they needed attention or assistance. She was very inattentive to the children during these visits."

- "[Mother's] disassociation to the children, her inability to recognize their needs and address those needs, would make it dangerous for her to care for the children alone."

- Mother had lived at an apartment complex "for approximately 2 years at the time of trial . . . through a program at Community Healthcore . . . [and] receive[d] assistance from Community Healthcore to keep and maintain this apartment."

- "There was an occasion in 2019 where [Mother] loaned her car to a homeless man in Houston, Texas[,] who she did not know. He stole her car."

- "[Mother] receives a monthly disability check related to her mental illness [and] . . . pays a 'person' to assist her with her finances, including paying her monthly bills and providing her a spending allowance."

- "[Mother' is diagnosed with delusional disorder and bipolar II disorder" and "is presently diagnosed with major depressive disorder," which is "severe with psychotic symptoms." "[Mother] sometimes responds to internal stimuli, meaning she sometimes hears voices."

13

- "[Mother] has extreme difficulty with remembering and retaining information, concentration, focus and attention"; "suffers from some cognitive deficits"; and "also suffers from schizotypal personality disorder." Mother "cannot shop for groceries without assistance."

- "It would be dangerous for [Mother] to have her children living with her, or be in a position[] where she was caring for them on a regular basis because she makes poor decisions which could affect their safety and well-being."

- "[Mother's] mental conditions and personality disorders have not improved in the 2 years Ms. Prince has been working with her," she "has a history of not being compliant in taking her prescribed medication," and "sometimes she takes her medications and other times she does not."

- "[Mother sometimes] suffers from hallucinations and delusions and this is especially true when she is under stress. She does not always live in reality."

The findings of fact also contained the following, which are challenged findings on appeal:

- "The children do not gain any benefit from visits with [Mother]. Neither the children nor [Mother] are bonded to one another as parents and children normally bond. There exists no real parent-child relationship between them."

- "The children see their foster parents as their parents. They have a very warm and loving relationship. The children are extremely happy and well-adjusted with their foster parents. They are the only parents they have ever really known. Their home is the only home the children have known."

- "The children will garner no benefit from further contact with [Mother]. Continued contact with [Mother] would be detrimental and confusing to the children. The children do not seek out any type of relationship with [Mother]."

- "At the time of the trial in the present case, the children do not recognize [Mother] as their mother. The children see their foster parents as their parents."

- "[Mother]'s mental health issues and the problems and consequences resulting from her mental health issues are not likely to improve in the future."

14

*(2)      Sufficient Evidence Supported the Trial Court's Judgment*

Mother argues that the trial court erred by terminating her parental rights, because the evidence was legally and factually insufficient to (a) show a material and substantial change in the parties' circumstances or (b) prove a statutory ground for termination of parental rights.

*a.      There Was a Material and Substantial Change in the Parties' Circumstances*

"A court with continuing, exclusive jurisdiction may modify an order that provides for the conservatorship, support, or possession of and access to a child."  TEX. FAM. CODE ANN. § 156.001.  In relevant part, Section 156.101 states,

> (a)      The court may modify an order that provides for the appointment of a conservator of a child, that provides the terms and conditions of conservatorship, or that provides for the possession of or access to a child if modification would be in the best interest of the child and:
>
> > (1)      the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the earlier of:
> >
> > > (A)      the date of the rendition of the order; or
> > >
> > > (B)      the date of the signing of a mediated or collaborative law settlement agreement on which the order is based.

TEX. FAM. CODE ANN. § 156.101(a).  Mother argues that the Department failed to establish a material and substantial change in her circumstances.  We disagree.

Both the MSA and the Prior Order retained Mother and Father as possessory conservators and required Mother and Father to pay child support.  At trial, it was undisputed that Father had since relinquished his parental rights, and we find that this showed a material and substantial change in the parties' circumstances.  *See In re S.N.Z.*, 421 S.W.3d 899, 909 (Tex. App.—Dallas

15

2014, pet. denied) ("Material changes may include . . . a parent's becoming an improper person to exercise custody."); *In re M.F.*, No. 11-08-00276-CV, 2010 WL 1948625, at *2 (Tex. App.—Eastland May 13, 2010, no pet.) (mem. op.). Moreover, Mother tested positive for cocaine after signing the MSA, failed to comply with the MSA's provisions to pay child support, and missed many opportunities for visitation with the children, which resulted in Mother having no contact with the young children for several months. *See In re A.E.*, No. 13-14-00124-CV, 2014 WL 4161587, at *5–6 (Tex. App.—Corpus Christi Aug. 21, 2014, no pet.) (mem. op.) (holding that drug use is sufficient to constitute a material and substantial change). We conclude that there was sufficient evidence to show a material and substantial change in the parties' circumstances.

> b.      *Sufficient Evidence Supported Termination of Mother's Parental Rights Under Section 161.003*

Mother also argues that the evidence is legally and factually insufficient to show that the Department proved a statutory ground for termination of parental rights. The trial court specified that it was terminating Mother's parental rights on Section 161.003 grounds only, not on grounds found in Section 161.004, which had been also specifically pled by the Department. Even so, Mother focuses her appellate argument on Section 161.004, titled "Termination of Parental Rights After Denial of Prior Petition to Terminate,"[8] and argues that the evidence at trial did not

---

[8]Section 161.004 reads,

> (a)      The court may terminate the parent-child relationship after rendition of an order that previously denied termination of the parent-child relationship if:

> > (1)      the petition under this section is filed after the date the order denying termination was rendered;

16

meet this statutory ground for termination of parental rights because, among other things, Mother's circumstances had not materially and substantially changed and the MSA and Prior Order precluded the Department from relying on Mother's acts or omissions occurring before the Prior Order. However, despite its title, Section 161.004 is not the only method to terminate parental rights after a prior denial of a petition to terminate. *In re D.N.*, 405 S.W.3d 863, 869–70 (Tex. App.—Amarillo 2013, no pet.) (discussing *In re K.G.*, 350 S.W.3d 338, 346–53 (Tex. App.—Fort Worth 2011, pet. denied)). Instead, a "trial court can terminate the parent-child relationship, even though it previously denied termination in another order, using section 161.001 [or section 161.003] alone if termination is sought on evidence of acts or omissions having occurred since the earlier order in which termination was denied." *Id.* at 870 (citing *K.G.*, 350 S.W.3d at 352); *In re M.A.*, No. 04-19-00648-CV, 2020 WL 908025, at *5 (Tex. App.— San Antonio Feb. 26, 2020, no pet.) (mem. op.)). "But, to rely on acts or omissions evidence of which has been presented to the trial court before the earlier order denying termination, the Department must garner sufficient evidence of section 161.004's elements, including a material and substantial change of the parties' circumstances." *D.N.*, 405 S.W.3d at 869–70 (citing *K.G.*,

---

(2)    the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date that the order was rendered;

(3)    the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered; and

(4)    termination is in the best interest of the child.

(b)    At a hearing under this section, the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child.

Tex. Fam. Code Ann. § 161.004.

350 S.W.3d at 352). Mother argues that the Department could not rely on her acts and omissions occurring before the Prior Order because her circumstances did not materially and substantially change. Even focusing only on Mother's acts and omissions that occurred after the Prior Order, we find legally and factually sufficient evidence to support termination under Section 161.003 grounds.

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). This Court is required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014)). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of

18

proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007 (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009))). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (citing *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002))))). "If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not

have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). In making this determination, we must undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *C.H.*, 89 S.W.3d at 26)).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *Id.* (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)) (citing *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003))). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26)).

Here, termination was ordered under Section 161.003 of the Texas Family Code, which reads,

> The court may order termination of the parent-child relationship in a suit filed by the Department of Family and Protective Services if the court finds that:
>
> (1)    the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child;
>
> (2)    the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;
>
> (3)    the department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination held in accordance with Subsection (c);

20

(4)     the department has made reasonable efforts to return the child to the parent; and

(5)     the termination is in the best interest of the child.

TEX. FAM. CODE ANN. § 161.003(a) (Supp.).

Mother does not challenge the sufficiency of the evidence to support the trial court's findings that Mother "has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child" or that "the department has been the temporary or sole managing conservator of the child . . . for at least six months preceding the date of the hearing on the termination." TEX. FAM. CODE ANN. § 161.003(a)(1), (3). Additionally, while Mother generally challenges the termination of her parental rights, she has failed to preserve any challenge to the trial court's finding that termination of her parental rights was in the children's best interests.[9] *See* TEX. FAM. CODE ANN. § 161.003(a)(5).

As a result, only two of the findings required to support termination of parental rights under Section 161.003 are fairly at issue. Accordingly, we examine whether legally and factually sufficient evidence supported the findings that Mother's "illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render [her]

---

[9]"The Rules of Appellate Procedure require that the appellant's brief 'contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.'" *In re Q.C.*, No. 06-19-00026-CV, 2019 WL 3483935, at *3 (Tex. App.—Texarkana Aug. 1, 2019, no pet.) (mem. op.) (quoting *In re D.V.*, No. 06-16-00065-CV, 2017 WL 1018606, at *7 (Tex. App.—Texarkana Mar. 16, 2017, pet. denied) (mem. op.) (quoting TEX. R. APP. P. 38.1(i))); *see In re J.Y.*, 528 S.W.3d 679, 688 (Tex. App.—Texarkana 2017, no pet.). In her brief, Mother fails to cite to relevant authority or provide any substantive analysis of why the evidence was legally or factually insufficient to support the trial court's best-interests findings. Therefore, assuming that Mother's brief could somehow be read to include a challenge to the best-interest finding, we find that it is waived due to inadequate briefing. *See Q.C.*, 2019 WL 3483935, at *3; *D.V.*, 2017 WL 1018606, at *7.

unable to provide for the child[ren]'s needs until the 18th birthday of the child[ren]" and "the department has made reasonable efforts to return the child[ren] to the parent." TEX. FAM. CODE ANN. § 161.003(a)(2), (4).

"A mental illness or deficiency of a parent is not, in and of itself, grounds for termination of the parent-child relationship." *M.A.*, 2020 WL 908025, at \*4 (quoting *In re B.J.C.*, 495 S.W.3d 29, 36 (Tex. App.—Houston [14th Dist.] 2016, no pet.)). "Evidence must support a determination that a parent's mental illness or deficiency prevents her from providing for her child now and in the future." *Id.* (citing *B.J.C.*, 495 S.W.3d at 36). Even so, "Section 161.003 requires only that the Department produce evidence that the mental deficiency, *in all reasonable probability*, renders the parent unable to care for the child." *Id.* at \*5 (citing TEX. FAM. CODE ANN. § 161.003(a) (emphasis added)). "In all reasonable probability" does not require proof beyond a reasonable doubt or "scientific certainty." *Id.* (citing *In re A.M.C.*, No. 04-18-00219-CV, 2018 WL 3440686, at \*2 (Tex. App.—San Antonio July 18, 2018, pet. denied) (mem. op.)).

As for this element of Section 161.003, Mother challenges only the finding that her "mental health issues and the problems and consequences resulting from her mental health issues are not likely to improve in the future." She does not challenge the trial court's findings that she "is presently diagnosed with major depressive disorder," which is "severe with psychotic symptoms," responds to internal stimuli, suffers cognitive defects and other mental health disorders, and is noncompliant with medication. Mother also does not challenge the trial court's

22

finding that her "mental conditions and personality disorders have not improved in the 2 years Ms. Prince has been working with her."[10]

At trial, Mother testified that she began hearing her father speak to her from heaven after the Prior Order had been entered and that she was diagnosed with a different mental health issue. Murphy testified that Mother experienced psychosis, would "not live in our reality or live in the fringes of our reality at best," and that her schizotypal personality disorder was "likely something that [Mother] would deal with for the rest of [her] life." Murphy also testified that Mother's improvement of her mental condition was unlikely, although "within the realm of possibility," and that he had not seen Mother significantly improve since coming to Community Healthcore.

Prince testified that Mother would have a chance of improvement if she regularly took her medicine but that she did not take medicine as prescribed and had not made any progress. Prince also noticed that Mother responded to internal stimuli, which Boynton testified was a sign that her mental condition was worsening. Prince also testified that Mother continued to have cognitive deficiencies and could not remember conversations. The evidence showed that, since the Prior Order, Mother used cocaine, loaned money to others even though she needed it to pay rent, put herself in a position for a homeless man to steal her car, let a man she did not know well sleep in her apartment while possessing a weapon, ripped a smoke detector from her ceiling and never replaced it, and still needed hands-on care to pay bills, shop for groceries, and make doctor appointments.

---

[10]Unless no evidence supports the finding, or the contrary is established as a matter of law, we are bound by the trial court's unchallenged findings of fact. *Pettit v. Tabor*, No. 06-19-00002-CV, 2020 WL 216025, at *13 (Tex. App.—Texarkana Jan. 15, 2020, pet. denied) (mem. op.) (citing *In re E.R.C.*, 496 S.W.3d 270, 288 (Tex. App.—Texarkana 2016, pet. denied)).

23

Murphy and Boynton both testified that they were concerned for the children's safety if Mother is noncompliant with her medication, and Prince testified that Mother made "very poor choices," which would make it hard to take care of children appropriately and that, in her opinion, the children could not be left with Mother, even for an hour.

The evidence showed that Mother's mental health had not improved after the Prior Order and that she did not progress to the point where she could independently care for herself or meet the physical or emotional needs of her children. *See M.A.*, 2020 WL 908025, at \*4 (citing *B.J.C.*, 495 S.W.3d at 37–38) (holding evidence supported termination under Section 161.003 when evidence showed mother failed to progress). Her non-compliance with mental health medication could also be considered in determining whether a parent-child relationship should be terminated under Section 161.003. *See In re B.A.*, No. 09-20-00216-CV, 2021 WL 1217334, at \*12 (Tex. App.—Beaumont Apr. 1, 2021, no pet. h.) (mem. op.); *In re L.L.F.*, No. 02-11-00485-CV, 2012 WL 2923291, at \*15 (Tex. App.—Fort Worth July 19, 2012, no pet.) (mem. op.).

We conclude that the evidence, which supported the trial court's unchallenged findings of fact, is both legally and factually sufficient to support the trial court's finding that Mother's "illness or deficiency, in all reasonable probability, proved by clear and convincing evidence," would continue to render her unable to provide for Isabelle's and Amy's needs until their eighteenth birthdays. *See In re E.R.*, 555 S.W.3d 796, 808 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *B.J.C.*, 495 S.W.3d at 37–38).

Next, we determine whether the Department made reasonable efforts to return the children to Mother. The trial court's letter ruling stated that the Department could rely on its

24

efforts to return the children to Mother before the Prior Order.[11]  We agree.  While the Department was precluded from relying on Mother's acts or omissions occurring before the Prior Order, nothing shows that the Department could not rely on its prior efforts to return the children to Mother.  *Cf.* TEX. FAM. CODE ANN. § 161.004(b) (permitting the trial court to consider evidence "at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child," even though parental-rights termination was previously denied).

"A family service plan is designed to reunify a parent with a child who has been removed by the Department."  *In re J.C.*, No. 04-17-00828-CV, 2018 WL 1733139, at *3 (Tex. App.—San Antonio Apr. 11, 2018, no pet.) (mem. op.); *see Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 795 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *In re A.H.*, No. 09-19-00167-CV, 2019 WL 4865196, at *4 (Tex. App.—Beaumont Oct. 3, 2019, no pet.) (mem. op.) ("In assessing the Department's efforts, ideal efforts need not be shown—only reasonable efforts.").  "'Implementation of a family service plan by the Department is considered a reasonable effort to return a child' to his parent 'if the parent has been given a reasonable opportunity to comply with the terms of the plan.'"  *J.C.*, 2018 WL 1733139, at *3 (quoting *In re A.Q.W.*, 395 S.W.3d 285, 288 (Tex. App.—San Antonio 2013, no pet.), *overruled on other grounds by In re J.M.T.*, 617 S.W.3d 604, 611 (Tex. App.—San Antonio 2020, no pet.); *In re*

---

[11]The trial court relied on an opinion by our sister court, which found that reunification efforts in a prior case that resulted in the denial of termination of parental rights could be used to support subsequent termination of parental rights to the same child.  *In re H.J.Y.S.*, No. 10-19-00325-CV, 2019 WL 8071614, at *7 (Tex. App.—Waco Feb. 26, 2019, pet. denied).

*J.J.W.*, No. 06-09-00030-CV, 2009 WL 2432634, at *4 (Tex. App.—Texarkana Aug. 11, 2009, pet. denied) (mem. op.)).

Here, the trial court entered a finding that, between 2016 and the entry of the Prior Order, "the Department offered [Mother] services in [an] attempt to return the children to her care[,] [Mother] worked almost all, if not all of the services ordered by the Court[,] . . . [but Mother] was unable to demonstrate she had learned from the services." Mother does not challenge this finding, which was supported by Writt's testimony about Mother's family service plan. Even after the Prior Order was entered, the Department provided Mother with another family service plan signed by Mother and Writt, which provided an opportunity for Mother to treat her mental health and form an appropriate bond with the children through visitation while retaining parental rights.

After a mother receives services under a family service plan, termination is supported under Section 161.003 when she "d[oes] not show significant improvement in her ability to care for the child[ren] due to her inability to provide for her own medical needs." *Liu*, 273 S.W.3d at 795 (citing *Rodriguez v. DFPS*, No. 03-05-00321-CV, 2006 WL 1358488, at *7 (Tex. App.— Austin May 19, 2006, no pet.) (mem. op.) (fact-finder could determine that Department made reasonable efforts to return children to mother when she "did not demonstrate any of the abilities she may have learned in the parenting classes or in-home services that would indicate any significant changes in her ability to parent")).

The testimony at trial showed that Mother did not show significant improvement in her ability to care for Isabelle and Amy. Writt testified that Mother's parenting skills and mental

26

health never improved, and she failed to demonstrate that she learned from the services provided to her. Mother missed many opportunities to visit her children, and Angel and Jones both testified that Mother would "zone out" when visiting and failed to develop a connection with them due to her minimal interaction.[12]

After reviewing the evidence, we conclude that a fact-finder could reasonably form a firm belief or conviction that, under these circumstances, the Department made reasonable efforts to reunite Mother with Isabelle and Amy. As a result, we find that legally and factually sufficient evidence supported the trial court's finding under Section 161.003(a)(4).

Because legally and factually sufficient evidence supported the trial court's termination of Mother's parental rights under Section 161.003, we overrule this point of error.

---

[12]Mother complains that the evidence did not support the findings that (1) "The children do not gain any benefit from visits with [Mother]. Neither the children nor [Mother] are bonded to one another as parents and children normally bond. There exists no real parent-child relationship between them"; (2) "The children see their foster parents as their parents. They have a very warm and loving relationship. The children are extremely happy and well-adjusted with their foster parents. They are the only parents they have ever really known. Their home is the only home the children have known"; (3) "The children will garner no benefit from further contact with [Mother]. Continued contact with [Mother] would be detrimental and confusing to the children. The children do not seek out any type of relationship with [Mother]"; and (4) "At the time of the trial in the present case, the children do not recognize [Mother] as their mother. The children see their foster parents as their parents." While these findings are not dispositive of the sufficiency of the evidence to support the Section 161.003 requirements, the record contained evidence supporting the challenged findings. Jones and Angel testified that Isabelle and Amy were confused when left with Mother and that the visits did not make sense to them. Jones testified that there was no bond between Mother and her children, and both Angel and Jones opined that the visits did not benefit the children. The evidence at trial also showed that the children had lived with their foster parents since they were one and four months old and that they were bonded with their foster parents, who had served as the children's parents from a young age. The evidence also showed that the children were not bonded to Mother, who did not see the children for long periods of time, and Wilma testified that Isabelle did not see Mother as a parental figure, but only as friend for a "play date."

*(3)*     *Mother Failed to Preserve Her Claims of Res Judicata and Collateral Estoppel*

Mother also argues that res judicata and collateral estoppel barred the subsequent termination of her parental rights because the Department had raised the same grounds in the prior case, which resulted in the MSA. The Department argues that the issue is unpreserved. We agree.

Res judicata and collateral estoppel are both "affirmative defenses . . . [that] must be pled" unless tried by consent. *In re Commitment of Metcalf*, 602 S.W.3d 609, 621 (Tex. App.—Texarkana 2020, pet. denied) (citing Tex. R. Civ. P. 94); *see Loya Ins. Co. v. Avalos*, 610 S.W.3d 878, 882 (Tex. 2020); *Est. of Riefler*, No. 02-19-00189-CV, 2020 WL 7063486, at *4 (Tex. App.—Fort Worth Dec. 3, 2020, no pet.) (mem. op.). It is undisputed that Mother did not plead res judicata or collateral estoppel, but instead first raised these issues in a motion for new trial. However, "a motion for new trial . . . is simply 'too late to equate to a timely affirmative pleading," and as a result, "[a]n affirmative defense raised for the first time in a motion for new trial is untimely." *Reifler*, 2020 WL 7063486, at *4 (quoting *Reid v. UDR Tex. Props., LLC*, No. 02-15-00108-CV, 2016 WL 7448362, at *3 (Tex. App.—Fort Worth Dec. 28, 2016, no pet.) (mem. op. on reh'g) (citing *In re J.P.*, 296 S.W.3d 830, 837 (Tex. App.—Fort Worth 2009, no pet.); *Hollingsworth v. Hollingsworth*, 274 S.W.3d 811, 815 (Tex. App.—Dallas 2008, no pet.)).

Yet, Mother pleads, in the alternative, that res judicata and collateral estoppel were tried by consent. They were not.

Trial by consent "applies only where it appears from the record that the issue was actually tried, although not pleaded." *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d

28

760, 771 (Tex. App.—Dallas 2005, pet. denied) (quoting *Johnston v. McKinney Am., Inc.*, 9 S.W.3d 271, 281 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (citation omitted); (citing *Libhart v. Copeland*, 949 S.W.2d 783, 797 (Tex. App.—Waco 1997, no writ) (trial by consent limited to those exceptional cases where the parties "clearly" tried unpleaded issue)). Trial by consent, which "is the exception, not the rule," does not apply "when evidence relevant to an unpleaded matter is also relevant to a pleaded issue [because], in that case[,] admission of the evidence would not be calculated to elicit an objection, . . . and its admission ordinarily would not demonstrate a 'clear intent' on the part of all parties to try the unpleaded issue." *Reifler*, 2020 WL 7063486, at *4 (quoting *In re J.M.*, 156 S.W.3d 696, 705 (Tex. App.—Dallas 2005, no pet.) (citing *Whatley v. City of Dallas*, 758 S.W.2d 301, 306 (Tex. App.—Dallas 1988, writ denied))).

Here, the words res judicata or collateral estoppel were never uttered during trial, and nothing shows that the parties contemplated the arguments raised on appeal with respect to these affirmative defenses at trial. To establish trial by consent, Mother argues that she "raised the prior disposition of the case by referring to how the case had already been resolved by the first order—that there was no substantial or material change in much of anything between then and now." Rather than indicating that the proceeding was barred by res judicata or collateral estoppel, Mother's reference to the trial transcript simply showed that she was challenging the Department's representation that a material and substantial change in the parties' circumstances supported a modification of the Prior Order. Further, our review of the transcript shows no understanding among the parties that res judicata or collateral estoppel were considered at trial.

29

As a result, we conclude that the affirmative defenses of res judicata and collateral estoppel were not tried by consent.

Because Mother failed to preserve her complaints that res judicata or collateral estoppel barred the termination of her parental rights, we overrule the points of error related to these complaints.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     April 27, 2021
Date Decided:       May 19, 2021