**Affirmed and Memorandum Opinion filed March 1, 2022.**



In The

# Fourteenth Court of Appeals

## NO. 14-21-00563-CV

## IN THE INTEREST OF M.L.H., A.E.H. AND N.E.H., CHILDREN

**On Appeal from the County Court at Law**
**Austin County, Texas**
**Trial Court Cause No. 2020L-7541**

## MEMORANDUM OPINION

Appellant H.K. (Mother) appeals the trial court's final order terminating her parental rights to M.L.H. (Martin), A.E.H. (Anna), and N.E.H. (Nancy),[1] and appointing the Department of Family and Protective Services as sole managing conservator of the children. Mother contends the evidence is legally and factually insufficient to support the trial court's predicate findings for termination on endangerment, and factually insufficient to support the trial court's predicate finding

---

[1] Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minors and other individuals involved in this case.

that Mother failed to comply with a Family Service Plan. Mother further contends the evidence is legally and factually insufficient to support the best-interest finding, and the trial court abused its discretion by appointing the Department as managing conservator of the children. We affirm.

BACKGROUND

## I. History with the Department and Removal

The Department filed an original petition to terminate Mother's parental rights on January 15, 2020. According to the removal affidavit attached to the petition, on November 23, 2019, it was reported to the Department that Mother's boyfriend had accidentally shot himself in the stomach while cleaning his gun in the home with Mother and the children. All three children were present in the home at the time of the shooting.

On the day of the report an investigator contacted Mother at her home where she and the children lived. The investigator confirmed that the boyfriend (Dustin) did indeed shoot himself while cleaning a gun in the presence of the children. Mother, the boyfriend, and the three children were living in one bedroom of a home owned by Wendy Perez. Thick blankets were draped over the doorway to the bedroom to retain heat in the room.

Two days later a law enforcement officer called the investigator. The officer was at Mother's home and expressed concern with the "amount of items" in the home and the use of only one space heater for warmth. Nancy was wearing only a diaper and her feet were purple. Mother reported that Nancy had "circulation issues." Mother reported that she would take Nancy to see a doctor.

Perez, who was described as the Godmother to the children, also called the investigator and expressed concern about the children. Perez reported that Mother

2

only bathed the children and changed their diapers when instructed. Perez provided diapers to Mother and fed the children because Mother only fed the children when she was hungry.

The investigator also spoke with Dustin about the shooting incident. Dustin admitted that he was "cycling bullets" through the gun when it accidentally discharged. When asked about a safer way to clean the gun Dustin responded that "he did not think of it." Dustin also admitted to an earlier incident in which he fired a weapon inside the home. He asserted that it was accidental, and the children were not in the home at that time.

One day after the interviews another report came into the Department alleging neglectful supervision of Martin, and sexual abuse of Nancy and Anna. The report alleged that Martin fell off a piece of furniture in the home cutting his foot on a piece of glass. It was also reported that Anna had a bruise on her cheek that appeared in the shape of knuckles.

The investigator visited Mother's home approximately one month later. At that visit Martin carried a pair of scissors from the kitchen and gave them to the investigator. Mother explained that she had forgotten to lock the kitchen door earlier. Mother told the investigator that she had broken up with her boyfriend but he would continue to pay Mother's electric and phone bills.

Several weeks later Perez reported that Mother attempted to jump out of Perez's moving vehicle because Mother was upset Perez would not pay her phone bill. Mother did exit the vehicle when Perez stopped at a stop sign, leaving Anna in the car with Perez. Perez reported Mother had expressed suicidal thoughts to her.

At a Family Team Meeting, it was determined that Mother was overwhelmed with her children and had a very limited support system. Concerns were also

expressed about Mother's mental health and noncompliance with prescribed medications. Mother left the meeting at one point but returned stating she did not have help and had to bathe her children by herself every day. Mother left the meeting a second time when her comments expressing suicidal ideation were discussed.

The Department conducted a search for a safe placement for the children but was unable to find one. While a Department worker was watching the children, the worker discovered that Anna had a "bad diaper rash to the point there were blisters forming." When asked how often Mother changed Anna's diaper her answers were inconsistent. Due to Mother's unaddressed mental health concerns and "lack of basic, general care of the children" the Department requested emergency removal.

The pretrial removal affidavit also listed Mother's history with the Department dating back to January 19, 2017. The history reported (1) Mother's admission of methamphetamine use during pregnancy; (2) abuse of Martin that was documented by Martin's father on social media; (3) Mother's inability to care for Martin while pregnant with her second child; (4) a lack of stable housing and prenatal care while Mother was pregnant with her second child; and (5) a report of domestic violence in the home for which law enforcement was called. The first four intake reports were disposed of as "ruled out"; the final report was disposed of as "unable to determine."

## II.  Trial

Patricia Penner of the Sealy Pregnancy Center (the Center) testified that the Center helps mothers from pregnancy through the first three years of a child's life. Penner testified that Mother came to the Center when she was pregnant with Martin and registered for services. The Center provided prenatal and parental classes in addition to diapers, wipes, and other needs of the baby. After initially registering, Mother did not come back to the Center until the day before Martin was born. The

Center provided Mother with a car seat and additional items needed for the baby.

Penner and other counselors at the Center took notes each time they had contact with Mother. Those notes were admitted into evidence and detailed the following relevant contacts:

- On December 3, 2017, Mother was living in a place called Rooms For Rent and the Center provided a bassinette and baby supplies; Mother would not allow Penner to see inside her room.

- On May 31, 2018, Mother called indicating that she and her boyfriend had "split up" and she was left without formula for the baby or transportation.

- On June 12, 2018, Mother called indicating her boyfriend had left her and she needed diapers.

- On September 10, 2018, Mother reported she was raped by a man she was living with at the time.

- On October 25, 2018, the Department visited Mother's house and noticed a bruise on her face.

- On August 22, 2019, Mother reported that her case with the Department should close soon and that her children were happy with Dustin in the house; Dustin was "doing a great job fathering the kids."

- On August 25, 2019, Mother reported that Dustin had left her and the children and that she needed diapers for the children.

- On January 14, 2020, Mother called to report that the Department was removing the children because Perez reported that Mother tried to jump out of a moving car.

- On March 9, 2020, Mother reported that she was moving in with a new boyfriend and quitting her job because the new boyfriend would take care of her.

- On July 16-17, 2020, Mother reported the new boyfriend had choked her and wanted her out of the house by the end of the month.

- On August 31, 2020, Mother reported that the new boyfriend was going to let her stay through the week.

- On September 23, 2020, Mother reported that the boyfriend wanted her out of the house again.

Penner testified that she had observed a pattern of Mother being abused by the men she lived with, describing three times Mother reported physical abuse to her.

Penner counseled Mother on a "life plan" to help Mother get out of the cycle of domestic violence. The plan was developed to aid Mother in becoming independent so she would not have to rely on men for the support of her children. The plan was a detailed step-by-step guide designed to aid Mother in finding work, completing her education, and obtaining daycare so she could obtain employment. A plan update on the first page of the plan noted:

> Update: 2021- We have tried to re-visit this document several times, however [Mother] seems dis-interested in making the necessary changes to get her life back on track. She is more interested in finding a male partner to finance her and her children's li[ves]. She indicated that she is incapable of living on her own and taking care of normal day-to-day business necessary to manage a family household. My concern has and continues to be that every man who enters her life has a violent temperament and she requires the children to call him "Daddy" which is highly unhealthy and confusing for the children.

Jennifer Heitshusen, a volunteer at the Center, was assigned to help Mother after the children were removed by the Department. Initially, Heitshusen was helping Mother regain custody of her children. At Mother's first meeting with Heitshusen Mother "verbalized understanding as to what she needed to do at the Sealy Pregnancy Resource Center to work towards getting her children back." A week later Heitshusen and Mother met again and Heitshusen reported that Mother had made progress toward taking parenting classes and increasing her hours at work. Two weeks later Mother reported being much happier and said she had a new boyfriend. Mother talked about working more hours but was not working full time. Heitshusen's last meeting with Mother was approximately one month after their first

meeting. At that meeting Mother reported that she was considering moving in with her boyfriend "because he could take care of her." Heitshusen expressed concern that Mother "allowed herself to become too distracted with this new boyfriend and is not adequately working toward completing required parenting classes."

Kimberly Kawuki, a Department caseworker, testified that she was a courtesy caseworker who helped the primary caseworker. Kawuki took several photographs of the children's home, which were admitted into evidence without objection. Kawuki testified that the photographs revealed several concerns about the children's welfare, including:

- prescription medications left in areas where the children could access them;
- limited space for the children to sleep and live;
- dirty water from the kitchen sink draining to the outside creating a potential health hazard; and
- sharp items including tools strewn around the outside of the house accessible and dangerous to the children.

When Kawuki tried to follow up to determine if any of her concerns for the children had been addressed, Mother's landlord prohibited access to the home.

Debra Lee, the Department caseworker, testified that the Family Service Plan required Mother to undergo psychosocial and psychiatric assessments and follow all recommendations. In addition, the plan required Mother to attend parenting classes and be able to demonstrate a change of behavior, have safe and stable housing and proof of income, and avoid all criminal activity.

Lee testified at the time of trial that Mother was living in a travel trailer on property owned by her boyfriend's family. As testified to by the other caseworker the trailer had "gray water" draining from the kitchen sink directly into the yard. Lee was also prohibited from returning to the home before trial because the landlord

7

refused entry to anyone from the Department. Lee testified that at the time she inspected Mother's home it was not a safe place for the children. There was an exposed electrical cord leading to the trailer in addition to another trailer on the property with exposed wires.

Lee testified that Mother experienced domestic violence at the hands of the children's father. Lee further testified that Mother's next boyfriend, Dustin, discharged a firearm while cleaning it in the house with the children present. Mother also reported that her current boyfriend had choked her. Mother had no family support and was unable to move away from the boyfriend due to lack of support.

In addition to evidence of domestic violence in the home, Lee testified that the children were not receiving adequate medical care. Anna was also observed with burns on the insides of her thighs from wearing a wet diaper. Lee further testified that before the children were removed, they were living in a cramped space where one of the children was able to retrieve a pair of scissors from the kitchen. At one time law enforcement officers were called due to concerns about the condition of the home.

As to the Department's plans for the children Lee testified that the children were placed in a licensed foster home with foster parents who wanted to adopt all three children.

Megan Gillson, the Court Appointed Special Advocate (CASA) volunteer, testified that she had visited the foster home where the children were placed. The children had bonded with the foster family and appeared happy. Gillson met with the children once a month and interacted with Mother between 15 and 20 times during the pendency of the case. Gillson expressed concern when Mother told her she was being "kicked out" of her living arrangement. CASA provided information about women's shelters, but Gillson later learned that Mother reconciled with her

boyfriend and continued to live in the trailer on land owned by the boyfriend's family.

After the Department rested, William Argabright, Mother's boyfriend, testified on her behalf. Argabright testified that there were seven trailers on his family's property where he and Mother lived. The owner of the property, Argabright's aunt, prohibited any member of the Department from visiting the property after a caseworker took photographs of the property. Argabright denied physically abusing Mother and denied that she considered moving out of his home or that he had asked her to leave the home. Argabright, an electrician, covered the electrical outlet leading from the trailer to the electrical source. Argabright was aware of the "gray water" draining in the yard and was planning to address it, but had not addressed it at the time of trial.

Mother testified about the accident in which Dustin shot himself while cleaning his gun. Mother said that Dustin was not living in the house at the time although it was after midnight when he shot himself. Mother further testified that he had shot himself earlier while he was living in the home. Despite the first accidental shooting Mother continued to allow Dustin to live in the same home as the children. In contrast to the reports of volunteers at the Center and the caseworker, Mother testified that Argabright had never physically abused her or choked her.

Mother admitted telling a counselor at the Center that she had been raped by a man named Donald Goucher with whom she was living at the time. Mother did not move out of the home after being raped because she had nowhere else to go. On cross-examination Mother accused counselors at the Center of lying about helping her with housing and job searches. Mother further accused the counselors of lying about reports of domestic violence.

At the conclusion of the final hearing the trial court granted the Department's

request for termination of both parents' parental rights. The trial court terminated Mother's parental rights on endangerment grounds and failure to comply with a Family Service Plan. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), & (O). The trial court further found that termination of both parents' rights was in the best interest of the children and appointed the Department as the sole managing conservator of the children. *See* Tex. Fam. Code § 161.001(b)(2). Mother appealed the trial court's order of termination. The children's father did not appeal.

## ANALYSIS

## I. Standard of Review

A parent's right to "the companionship, care, custody, and management" of her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982). The United States Supreme Court has emphasized that the interest of a parent in the care, custody, and control of her children—is perhaps the oldest of the fundamental liberty interests recognized by the Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right," the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights. *Id*. at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

10

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which the Department bore the burden of proof. *In re J.F.C.*, 96 S.W.3d at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which the Department bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## II. Predicate Ground of Endangerment

In Mother's first two issues she challenges the trial court's findings on endangerment under section 161.001(b)(1)(D) and (E) of the Family Code. Both

subsections D and E require proof of endangerment. To "endanger" means to expose the children to loss or injury or to jeopardize their emotional or physical health. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Children are endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *J.S. v. Tex. Dep't of Family & Protective Servs.*, 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. It is not necessary that the endangering conduct be directed at the children or that the children actually suffer injury. *Id.*

While both subsections D and E focus on endangerment, they differ regarding the source of the physical or emotional endangerment to the children. *See In re S.B.*, 597 S.W.3d 571, 583 (Tex. App.—Amarillo 2020, pet. denied). For instance, subsection D focuses on the children's surroundings and environment and requires a showing that the environment in which the children were placed endangered their physical or emotional health. *Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied); *see also In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.); *In re S.M.L.*, 171 S.W.3d at 477. "Environment" refers to the acceptability of the children's living conditions as well as the conduct of a parent or other person in the home because the conduct of a parent or other person can create an environment that endangers the children's physical and emotional well-being. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *see also In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied) ("It is illogical to reason that

12

inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, are not inherently a part of the 'conditions and surroundings'" of the home). Inappropriate, abusive, or violent conduct by a parent or other person living in the children's home is a part of the "conditions or surroundings" of the children's home and may produce an environment that endangers their physical or emotional well-being. *In re M.R.J.M.*, 280 S.W.3d at 502.

In evaluating endangerment under subsection D, we consider the children's environment before the Department obtained custody of the children. *See In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Under subsection E, however, courts may consider conduct both before and after the Department removed the children from the home. *See In re S.R.*, 452 S.W.3d at 361 (considering pattern of criminal behavior and imprisonment before and after removal).

A fact finder may infer from a parent's past conduct endangering the well-being of the children that similar conduct will recur in the future. *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.). Subsection D permits termination based upon a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Under subsection E, the relevant inquiry is whether evidence exists that the endangerment of the children's physical and emotional well-being was the direct result of a parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 361. It is not necessary to establish that a parent intended to endanger the children to support termination of the parent-child relationship. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). Termination under subsection E requires more than a single act or omission; a voluntary, deliberate, and conscious course of

conduct by the parent is required. *In re L.M.*, 572 S.W.3d 823, 834 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

While endangerment often involves physical endangerment, the statute does not require that conduct be directed at the children or that the children actually suffer injury; rather, the specific danger to the children's well-being may be inferred from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533. A parent's conduct that subjects children to a life of uncertainty and instability endangers the children's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018), pet. denied 579 S.W.3d 74 (Tex. 2019) (per curiam). "Among the types of actions or omissions constituting evidence meeting this standard are criminal activity, convictions, and incarceration; drug abuse, and knowledge that a child's parent abused drugs; permitting a child's access to harmful medication; and domestic violence and propensity for violence." *In re L.M.*, 572 S.W.3d at 834 (internal citations omitted).

This case began with an investigation into the children's home because Mother's boyfriend at the time accidentally shot himself while cleaning his gun. The record reflects that the children were in the home at the time of the accidental shooting and that it was not the first time the boyfriend had accidentally discharged the gun while living with Mother and her children.

Mother asserts in her brief that the Department failed to present evidence of the conditions of the home or endangerment to the children prior to the children being removed from the home. To the contrary, the Department presented detailed notes by volunteers and employees of the Center, which documented multiple reports of domestic violence committed by boyfriends living with Mother and some who had lived with the children. Mother testified about the accidental shootings in the home. Mother further testified about being subjected to domestic violence but

being unwilling or unable to leave the abuser because she had no other resources or support.

As to the conditions of the home, both Department caseworkers testified that "gray water" from the kitchen sink was allowed to drain into the yard where the children were expected to play. Lee, the primary caseworker, testified that prescription medications were left where children could access them, tools were strewn about also accessible to children, and that one of the children carried a pair of scissors from the kitchen.

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Mother's parental rights was justified under Family Code section 161.001(b)(1)(D) & (E). *See In re V.V.*, 349 S.W.3d 548, 556 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction."); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("Domestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment."); *Leal v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 315, 325 (Tex. App.—Austin 2000, no pet.), *disapproved on other grounds, In re J.F.C.*, 96 S.W.3d at 256, n.39 (mother endangered children by allowing access to medication that could have killed them if ingested). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(D) & (E). Accordingly, we conclude the evidence is legally and factually sufficient to support the trial court's findings of endangerment and we overrule Mother's first two issues.

Having concluded the evidence is legally and factually sufficient to support the trial court's endangerment findings, we need not review the sufficiency of the evidence to support the subsection O finding. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## III.   Best Interest of the Children

In her fourth issue, Mother contends that the evidence is legally and factually insufficient to support a finding that termination of her parental rights was in the children's best interest.

The purpose of the State's intervention in the parent-child relationship is to protect the best interest of the child, not to punish parents for their conduct. *In re A.V.*, 113 S.W.3d at 361. There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship. *In re B.J.C.*, 495 S.W.3d 29, 35 (Tex. App.—Houston [14th Dist.] 2016, no pet.). But there is also a presumption that the permanent placement of a child in a safe environment is in a child's best interest. Tex. Fam. Code § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d at 39 (noting that a child's need for permanence through the establishment of a stable, permanent home is the paramount consideration in a best-interest determination). The best-interest analysis is child-centered and focused on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).

In assessing whether the evidence is sufficient to prove that termination is in the best interest of a child, we may consider the non-exclusive factors discussed in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (1976). *See In re E.C.R.*, 402 S.W.3d 239, 249 & n.9 (Tex. 2013). These factors include (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the

individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.* (citing *Holley*, 544 S.W.2d at 371–72).

We may also consider the statutory factors in section 263.307 of the Family Code, including (1) the child's age; (2) the frequency and nature of out-of-home placements; (3) any history of substance abuse by the child's family or others who have access to the child's home; (4) the willingness and ability of parents to accept counseling services and to cooperate with the state's supervision; and (5) whether the parent has provided the child and other children under the parent's care with a safe physical home environment and protection from repeated exposure to violence, even though the violence may not be directed at the child. *See In re A.R.M.*, No 14-13-01039-CV, 2014 WL 1390285, at *9 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (citing Tex. Fam. Code § 263.307(b)).

## A. Children's Ages, Desires, Needs, Placement, and Plan

When the children were removed from the home, they were all under the age of four; the youngest was one year old. When there is no direct evidence of the children's desires and the children are too young to express their desires, the fact finder may consider that the children have bonded with a foster family, are well cared for by them, and have spent minimal time with a parent. *See In re A.M.W.*, No. 14-20-00742-CV, 2021 WL 1567762, at *5 (Tex. App.—Houston [14th Dist.] Apr. 22, 2021, pet. denied) (mem. op.).

Mother attended regular visits with the children, and they were excited to see her. By the time of trial, however, the children had not lived with Mother for more

than a year. The youngest child had spent more time in foster care than with Mother. Mother admitted not completing all necessary services to obtain the return of her children. Mother asserts the foster placements for the children have been detrimental and that there is no evidence that their current foster home will be a permanent home.

The record reflects that the children were in several foster homes before being placed in the foster-to-adopt home where they lived at the time of trial. The Department caseworker explained that the children were removed from the first foster home because the caretaker injured her arm and was no longer able to care for three small children. The children were removed from the second home due to personality conflicts between the CASA and the caretaker in addition to the caretaker's COVID concerns. The children were removed from the third foster home because Martin was injured when he put his hand into hot water that was being used to clean a bathroom. The fourth home was a temporary respite home while the Department searched for a permanent home. At the time of trial, the children were placed in a foster-to-adopt home where the children appeared to have bonded with the family and appeared happy. The foster home was willing to adopt all three children and keep the sibling group together.

The record reflects that from the date Mother reported her first pregnancy to the Center to the date the children were removed, Mother reported six different addresses. Mother repeatedly depended on boyfriends for housing and living expenses, but was unable to maintain stable housing during those years.

These factors weigh in favor of the trial court's best-interest finding. *Cf. Interest of K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.) (evidence of best interest found insufficient due in part to no evidence of immediate or near-immediate plans for permanent placement of the children).

## B.  Parent's Acts and Omissions, Excuses, and Domestic Violence

The trial court heard evidence that at least three men had perpetrated physical violence against Mother including the man Mother lived with at the time of trial and would have lived with the children had they been returned to Mother. Yet, Mother continued to associate with Argabright, her boyfriend at the time, and denied reporting that the children's father had choked her. Mother admitted she had been sexually assaulted by a former boyfriend but also admitted she could not leave him because she had no alternative means of support. Mother further admitted that the children were in the home when another boyfriend accidentally shot himself a second time. But Mother denied that the accidental discharge of a weapon in her home was a danger to the children because the children were in another room. From this evidence the trial court could have inferred that Mother was unwilling to accept the seriousness of her boyfriends' violence in endangering the children's physical and emotional well-being, and inferred that Mother was unwilling to effect positive change for the children's safety. *See In re T.E.C.*, No. 04-20-00351-CV, 2021 WL 41150, at *9 (Tex. App.—San Antonio Jan. 6, 2021, pet. denied) (mem. op.) (sufficient evidence to support best-interest finding, considering the mother's denial of any domestic violence and her refusal or inability to protect herself and the children from the father's violence, along with her failure to make sufficient changes in her own behavior).

These factors weigh in favor of the trial court's finding that termination was in the children's best interest.

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Mother's parental rights is in the best interest of the children. Further, considering the entire record, the disputed evidence that a reasonable factfinder could not have

credited in favor of the best-interest finding is not so significant that the trial court could not reasonably have formed a firm belief or conviction as to the truth of the best-interest finding.

We overrule Mother's fourth issue.

## IV. Conservatorship

In her fifth issue, Mother asserts the trial court abused its discretion by appointing the Department as the children's sole managing conservator.

A trial court's conservatorship decision is subject to review for an abuse of discretion and may be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). We consider whether the trial court had sufficient information upon which to exercise its discretion and whether the trial court erred in the application of its discretion. *In re P.N.T.*, 580 S.W.3d 331, 360 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

Appellant relies on the statutory presumptions, and cases applying the statutes, for parents to be appointed as managing and possessory conservators unless the trial court finds that the appointment would not be in the children's best interest. *See* Tex. Fam. Code §§ 151.131, 151.191. However, this court has held a trial court need not make any such finding following a termination of the parent's rights because the former parent is no longer a "parent" following the termination. *See Z.A.R. v. Tex. Dep't of Family and Protective Servs.*, No. 14-20-00511-CV, 2020 WL 7866800, at *15 (Tex. App.—Houston [14th Dist.] Dec. 31, 2020, pet. denied) (mem. op.).

Under Section 161.207(a) of the Family Code, following a termination of all parents' rights, a court "shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing

conservator of the child." Tex. Fam. Code § 161.207. The trial court's appointment of the Department as the sole managing conservator of a child is considered a "consequence of the termination" pursuant to Section 161.207. *In re V.A.*, 598 S.W.3d 317, 334 (Tex. App.—Houston [14th Dist.] 2020, pet. denied); *see also In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008) (per curiam).

Because the trial court terminated the parents' rights to the children, and we affirm that decision, we cannot say the trial court's decision to appoint the Department—an agency statutorily identified as an eligible managing conservator—instead of Mother was arbitrary or unreasonable. *See id.*

We overrule Mother's fifth issue.

## CONCLUSION

Having overruled Mother's issues necessary to the disposition of the appeal, we affirm the trial court's judgment.

/s/    Jerry Zimmerer
Justice

Panel consists of Justices Jewell, Zimmerer, and Hassan.

21